**John PLAIN, Plaintiff,**

v.

**David FLICKER Defendant.**

**Civ. A. No. 85–5213.**

United States District Court,
D. New Jersey.

Oct. 21, 1986.

John Plain, pro se.

Richard J. Doyle, Wall Township, N.J., for defendant through 8/15/86.

Johnstone, Skok, Loughlin & Lane, by Robert A. Ballard, Jr., Westfield, N.J., Substituted Attorneys for defendant effective 8/15/86.

DEBEVOISE, District Judge.

Plaintiff John Plain moves to amend his complaint against defendant David Flicker and to add defendant Dr. Richard Chopin to his cause of action.

## PROCEDURAL HISTORY

On February 10, 1986, I held a hearing on whether to adopt the Magistrate's recommendation to dismiss plaintiff's complaint for lack of subject matter jurisdiction. At that hearing, I granted plaintiff permission to file a motion seeking leave to amend his complaint for the purpose of asserting a federal cause of action. Plaintiff was stimulated to bring his motion by his adversary's motion to dismiss the action for failure to file a detailed amended complaint. Defendant now opposes plaintiff's motion seeking leave to amend his complaint.

## FACTS

Plaintiff appears *pro se.* Some of the facts he alleges appear in his brief but not in his complaint. In light of the Supreme Court's admonition that a *pro se* document is to be "liberally construed," *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), I will consider all of the facts plaintiff sets forth in both his brief

and amended complaint. Defendant · has been instructed to respond to all of the facts alleged by plaintiff.

The events giving rise to plaintiff's complaint occurred in November of 1968. Plaintiff was a guest in the home of Mr. and Mrs. Ward in Short Hills, New Jersey. He alleges that a physician he believed to be Dr. Flicker appeared at the Ward residence and told him he was having him committed to a mental institution. Shortly thereafter an ambulance and a police car arrived at the Ward's residence to transfer plaintiff to the Carrier Clinic, a private psychiatric clinic in Bell Meade, New Jersey. Plaintiff states that he was able to convince the physician to transport him in the physician's private car.

In 1984 plaintiff filed an ethics complaint against psychiatrist David Flicker with the Ethics Committee of the Essex County Medical Society alleging that Dr. Flicker had breached physician-patient confidentiality by informing another physician that Plain was "crazy." As the result of this complaint Jean Murphy, on behalf of the Ethics Committee, investigated plaintiff's complaint including his commitment to the Carrier Clinic. She informed plaintiff that Dr. Chopin had driven plaintiff to the clinic. Furthermore, she told plaintiff that the two physicians who had signed plaintiff's commitment papers were Drs. Flicker and Chopin. Plaintiff alleges that Dr. Flicker never examined him and hence the commitment order was executed in violation of New Jersey law which requires the signatures of two examining physicians.

Plaintiff asserts in Count I of his complaint that the commitment proceedings, beginning with the signing of a commitment certificate by Drs. Flicker and Chopin, continuing with the appearance by local police at the residence where he was staying, and culminating in his unwilling confinement in a mental institution, violated his civil rights as protected by 42 U.S.C. §§ 1983 and 1985. Plaintiff alleges that there was a conspiracy to involuntarily commit him to a mental institution in violation of New Jersey law. He further alleges that the presence of the police implicates the state in the commitment process, giving rise to the requisite state action necessary to maintain his claim under 42 U.S.C. § 1983. Plaintiff asserts in Count II that Drs. Flicker and Chopin committed medical malpractice during their interaction with him. Plaintiff has two difficult hurdles to surmount before he can amend his complaint. Sufficient state action must be pled to bring the allegations within the boundaries of the civil rights laws. Furthermore, plaintiff must overcome the argument that his action is barred by the appropriate statute of limitation.

A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1956). Notice pleading, which gives the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," is all that is required. All facts pled by the plaintiff must be taken as true and all reasonable inferences must be drawn in favor of the plaintiff. *Altemose Construction Co. v. Atlantic,* 493 F.Supp. 1181, 1183 (D.N.J. 1980), *citing McKnight v. Southeastern Pennsylvania Transportation Authority,* 583 F.2d 1229, 1235–36 (3d Cir.1978). To withstand a Fed.R.Civ.P. 12(b)(6) motion to ·dismiss, "[i]t is not necessary to plead evidence, nor is it necessary to plead facts upon which the claim is based." *Bogosian v. Gulf Oil Co.,* 561 F.2d 434, 446 (3d Cir.1977). Greater latitude than usual be given to plaintiff's complaint:

> [A] pro se complaint "however inartfully pleaded," must be held to less stringent standards than formal pleadings drafted by lawyers.

*Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), *quoting Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Defendant opposes plaintiff's motion to amend his complaint on two grounds in his cursory brief. Defendant argues that Dr.

Flicker's actions, as a private physician, fail to constitute state action as needed to maintain a civil rights suit under 42 U.S.C. § 1983. Furthermore, defendant contends that plaintiff's action is barred by the applicable statute of limitations. In his brief, defendant claims to have personally examined plaintiff on November 2, 1968 although no supporting affidavit accompanies the brief. Nor is it known when Dr. Flicker's "certificate or written statement" became part of a Class C detention application which was allegedly made by someone other than Dr. Flicker.

### A. *Statute of Limitations*

Plaintiff contends that his rights under 42 U.S.C. §§ 1983 and 1985 have been violated. Defendant argues that plaintiff's complaint is time barred. There is no federal limitations period governing these two sections of the civil rights laws. Instead the courts "borrow" the state law of limitations governing an analogous cause of action. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). In *Garcia v. Wilson,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) the Supreme Court held that claims under 42 U.S.C. § 1983 are best characterized as personal injuries and so should be governed by the appropriate state statute of limitations. In New Jersey the statute of limitations in personal injury actions is two years, N.J.S.A. 2A:14-2.

Since plaintiff's injury occurred in 1968 his cause of action would be barred unless he can allege that the statute was tolled or that his cause of action did not accrue until within two years of filing this action. State law governs the tolling of the statute, unless state law is inconsistent with the purposes behind the civil rights acts. *Board of Regents v. Tomanio,* 446 U.S. 478, 484–86, 100 S.Ct. 1790, 1795–96, 64 L.Ed.2d 440 (1980), *Aitchison v. Raffiani,* 708 F.2d 96, 101 (3d Cir.1983). However, the accrual of a civil rights action is a question of federal law. *Sandutch v. Muroski,* 684 F.2d 252, 254 (3rd Cir.1982) (per curiam). The Third Circuit has held that a

civil rights cause of action accrues when a plaintiff knows or has reason to know of the injury that is the basis of his action. *Id.* A discovery rule is applied by the Supreme Court, requiring that plaintiff must be aware of both the fact of injury and its causal connection to defendant but need not know that defendants conduct is tortious or unlawful. *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (discovery rule under Federal Torts Claims Act). *See Hauptmann v. Wilentz,* 570 F.Supp. 351 (1983), *aff'd,* 770 F.2d 1070 (3rd Cir.1985) (applying *Kubrick* rule to § 1983 claim). In *Kubrick* the Court overturned the Third Circuit's reasoning that a claim should not accrue until plaintiff knew or should have suspected that the doctor who caused his injury was legally blameworthy. The Court wrote:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to defendant or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask.

*Kubrick, supra,* 444 U.S. at 122, 100 S.Ct. at 359.

In the instant action plaintiff alleges that he was unaware of his injury at the hands of Drs. Flicker and Chopin because, since he was only seen by one doctor prior to the commitment, he had no way of knowing that another doctor had signed his commitment papers without examining him until the state brought this to his attention. But ignorance that the law required two signatures does not toll the statute. If plaintiff

felt he had been wrongfully committed, he could have investigated the circumstances of his commitment, including its legality within two years of the commitment.

■ Plaintiff argues that the statute should be tolled, directing the court to a recent opinion issued by the District of Columbia Court of Appeals. *Hohri v. United States*, 782 F.2d 227 (D.C.Cir.1986). In *Hohri* the court permitted plaintiffs to pursue Takings Clause claims based on injuries more than four decades old. Plaintiffs were imprisoned along with 120,000 other Japanese-American citizens in internment camps in the wake of Pearl Harbor during World War II. Their internment was ostensibly ordered to protect security along the West Coast. The court found that the statute of limitations governing the claims had been tolled due to the fraudulent concealment of information that prevented plaintiff from alleging a crucial element of his claim. In *Hohri*, plaintiffs demonstrated that the United States covered up critical evidence showing the lack of military justification for the internment. This concealment may have misled the Supreme Court causing it to deny the wartime legal challenges to the internment program. *Id.* at 252. In *Hohri* the court held that the statute of limitations was tolled by the doctrine of fraudulent concealment. Fraudulent concealment tolls the running of the statute until plaintiff discovers the cause of action or discovers facts that reasonably put him on notice of it. *Hauptmann v. Wilentz*, 570 F.Supp. 351, 397 (D.N.J.1983); *Foodtown v. Sigma Marketing Systems, Inc.*, 518 F.Supp. 485, 499 (D.N.J.1980); *Lopez v. Swyer*, 62 N.J. 267, 275 n. 2 (1973).

There are two types of fraudulent concealment: some wrongs are self concealing while others require an affirmative act of concealment.

In the first type, the most common, the fraud goes undiscovered even though the defendant after commission of the wrong does nothing to conceal it and the plaintiff has diligently inquired into its circumstances. The plaintiff's due diligence is essential here.... In the second type, the fraud goes undiscovered because the defendant has taken positive steps after commission of the fraud to keep it concealed.

*Tomera v. Galt*, 511 F.2d 504, 510 (7th Cir.1975).

The circuits that have considered the issue hold that self concealing fraud tolls the statute until plaintiff, exercising reasonable diligence, knew or should have known of the fraud. *Wachovia Bank & Trust Co. v. National Student Marketing Corp.*, 650 F.2d 342, 349 (D.C.Cir.1980); *cert. denied*, 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981); *King & King Enterprises v. Champlin Petroleum Products Co.*, 657 F.2d 1147, 1155 (10th Cir.1981), *cert. denied* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); *Robertson v. Seidman & Seidman*, 609 F.2d 583, 593 (2nd Cir. 1979); *Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir.1978); *Sperry v. Barggren*, 523 F.2d 708, 711 (7th Cir.1975); *Vanderboom v. Sexton*, 422 F.2d 1233, 1240 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970).

Wrongs that require an affirmative act to conceal them have not been treated consistently by the circuit courts. The Seventh, Second and D.C. Circuits have held that due diligence is not required to toll the statute. *Hohri v. United States*, 782 F.2d 227 (D.C.Cir.1986); *Tomera v. Galt*, 511 F.2d 504, 510 (7th Cir.1975); *Robertson v. Seidman & Seidman*, 609 F.2d 583, 593 (2nd Cir.1979). However, the majority of circuits have applied the same "due diligence" standard to both types of fraudulent concealment. *Campbell v. Upjohn*, 676 F.2d 1122, 1128 (6th Cir.1982); *State of Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 651 F.2d 687 (10th Cir.), *cert. denied* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1170 n. 27 (5th Cir. 1979), *cert. denied* 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980).

■ I believe the better view is that expressed by the majority of circuits in holding plaintiffs to a due diligence standard

for either type of fraudulent concealment. New Jersey has not yet addressed the issue but at least one member of this court has joined the majority view on the grounds that it best serves important public policies behind statutes of limitations. *Hauptmann v. Wilentz*, 570 F.Supp. 351 (D.N.J. 1983).

■ However, even if plaintiff were to allege fraudulent concealment it would not overcome his statute of limitations problem. Since ignorance of the law does not toll the statute of limitations, it must be presumed that plaintiff knew that he must be personally examined by two physicians within 10 days prior to the date of his commitment. With this knowledge plaintiff would have realized that his examination by only one physician violated state law and possibly his Constitutional rights. I can imagine no circumstances under which fraudulent concealment would have prevented plaintiff from uncovering the crucial elements of his claim. However, even if I were to permit plaintiff discovery on the issue of fraudulent concealment, his civil right claims could not survive. While I believe a civil commitment necessarily invokes state action, plaintiff, in alleging that Dr. Flicker violated New Jersey's commitment procedure, has failed to allege the elements of a Constitutional violation.

### B. *Finding State Action*

A class C detention is permitted "where the condition of the patient, in the judgment of the certifying physicians, is such that the patient should be placed under immediate restraint and confinement in an institution, and where it is impossible to obtain an order of temporary commitment"

from a municipal or county court. N.J.S.A. 30:4–38. A relative, sheriff, county prosecutor, director of welfare, police chief, caregiver, or institutional officer may commence a commitment action. N.J.S.A. 30:4–27. However, two doctors must sign a certificate or statement as to the "mental illness" of such patient for the purposes of securing his commitment. N.J.S.A. 30:4–29. No specific criteria for a finding of mental illness are set forth in the statute although mental illness is defined to mean "mental disease to such an extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of other or the community." N.J.S.A. 30:4–23. The Supreme Court goes further than the New Jersey statute in finding that the Constitution requires a demonstration of dangerousness to justify civil commitment. *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975).[1]

The physicians certifying the commitment need not be psychiatrists or neurologists but merely "of reputable character" and qualified as "practicing physicians." N.J.S.A. 30:4–29. A practicing physician for purposes of commitment is a physician who is licensed to practice medicine in any one of the United States, is not related to the patient by blood or marriage, and is not the director, chief executive officer, or proprietor of the institution to which the patient is to be admitted. N.J.S.A. 30:4–23. The physicians must base their certification of commitment on a personal examination of the subject of "the action, which must be made in every case by the physician signing the certificate ... no more than 10 days prior to the admission of such person to the hospital." N.J.S.A. 30:4–30. The

---

**1.** New Jersey courts have long imposed a "probable danger" standard upon involuntary civil commitments. *See In re Heukelekian,* 24 N.J. Super. 407, 94 A.2d 501 (App.Div.1953). However, it was not until 1975 that the Civil Practice Rules promulgated by the New Jersey Supreme Court were amended to require a certifying physician to state with particularity not only that the patient would be a probable danger to himself and others but also the facts upon which the physician relied in reaching this conclusion. The commitment forms prepared by the state

prior to 1975 did not require any such specific statement and "in fact both temporary and final commitment orders were routinely entered without the finding of probable danger either made or noted." Commentary by Sylvia B. Pressler to 1983 Edition of the Rules Governing the Courts of the State of New Jersey, C.Prac.R. 4:74–7. In 1978 the New Jersey 4:74–7 Civil Practice Rules were further amended to include probable danger to property as grounds for civil commitment.

certificate or written statement must report the physician's medical findings and set forth additional facts and circumstances on which the physician's opinion is based including a description of previous mental illnesses and a statement that the condition of the patient is such as to require care and treatment in a mental hospital and such other information as may be required to be furnished. N.J.S.A. 30:4–30. It is New Jersey Court Rules, rather than statutory law, which requires that the physicians certify as to the dangerousness of the patient. See footnote 1, *supra*.

No preliminary hearing is required prior to commitment or shortly thereafter. After two physicians have certified the need for a Class C commitment, the person bringing the action must present the complaint and certificates to the chief executive officer of the institution. N.J.S.A. 30:4–38. Such papers are the warrant and justification for temporary detention of the patient at the institution. The chief executive officer must certify them and mail them to the county adjuster who must present them to a court of the county for an order of temporary commitment.[2] The state allows up to 20 days to pass before a formal hearing must be held in the appropriate court with notice and representation for plaintiff. N.J.S.A. 30:4–38.[3] The issue of whether a

hearing held up to twenty days after confinement meets constitutional standards was litigated in this court. *Coll v. Hyland*, 411 F.Supp. 905 (D.N.J.1976). A three judge panel upheld state commitment procedures, pointing to a summary affirmance by the Supreme Court of a three judge ruling that a statute allowing confinement for up to 45 days without a hearing was constitutional. *Logan v. Arafeh*, 346 F.Supp. 1265 (D.Conn.1972), *aff'd sum. nom. Briggs v. Arafeh*, 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973).[4]

The district court panel did not rely exclusively on the Supreme Court's decision in *Logan* in upholding the constitutionality of New Jersey's involuntary commitment procedures. 411 F.Supp. 911. First, it stated that the hospital must be granted adequate time to conduct diagnostic tests. Second, court administration and counsel must be permitted the opportunity to prepare for an effective hearing. Such reasons need only be transported to the criminal context where an initial appearance before a magistrate must be held without "necessary delay" to demonstrate their inherent weakness. Fed.R.Crim.P. Rule 5.

However, in *Coll v. Hyland*, the court rejected the proposal that

since the loss of liberty involved in civil commitments is no less serious than in-

---

**2.** Under the 1975 amendments to the New Jersey Court Rules, the court order must set down the date for a hearing on whether continued commitment is justified. If the patient is unrepresented, the court must assign legal counsel. Notice of the hearing must be served on all parties and personally on the patient not less than 10 days in advance of the hearing.

**3.** Prior to the 1975 revision of the State Court Rules, no hearing was required unless the individual responded to the notice of hearing nor was representation required. *See* Pressler, *supra*, commentary to N.J.Civ.Practice Rules 4:74–7.

**4.** The professional group most concerned with commitment procedures does not recommend lengthy pretrial commitments.

The American Psychiatric Association began work on a proposal concerning civil commitment in the mid-1970's. In 1982 the Guidelines for Legislation on the Psychiatric Hospitalization of Adults was approved. The Guidelines

would permit a psychiatrist at a treatment facility to commit without a hearing for up to seven days. At that time an informal judicial hearing would be required. A probable cause determination by the court could lengthen the involuntary "emergency" evaluation and treatment to fourteen days. Commentators have recognized several problems with such a scheme. Since the examiner is the initial decisionmaker it raises the question whether a psychiatrist might have an incentive to commit for the week prior to the judicial hearing. This "puts the psychiatrist in the self-aggrandizing position of being able to recruit one's own involuntary clients." Schmidt, Critique of the American Psychiatric Association's Guidelines for State Legislation on Civil Commitment of the Mentally Ill, N.E.J. Confinement, 33 (1985). Another commentator on the Guidelines asserts that the Supreme Court requires "more due process than this ... to repossess a refrigerator." Rubenstein, the American Psychiatric Association's proposals on Civil Commitment, 17 Clearinghouse Rev. 558, 559 (1983).

carceration for a criminal offense the same procedural safeguards must apply. 411 F.Supp. at 912. The court grounded its rejection on the notion that "different bases underlie government power to punish criminals and to hospitalize the dangerous mentally-ill person." Punishment and protection of society were forwarded as grounds for incarceration of criminals. But the court recognized both the exercise of police power to protect society and the exercise of the doctrine of parens patriae to protect the individual from him or herself as justifications for civil commitment. "[B]oth are involved and both must be considered." Both duties were described as arising out of the historical responsibility of the sovereign to care for those who are mentally incompetent as well as to protect those who will be harmed if the patient is left at large. The opinion unambiguously defends the commitment process as a legitimate extension of the obligations and duties of the state to exercise its police power and parens patriae role.[5]

Given the recognition of the state's moral duty vis a vis the dangerously mentally ill, the failure of all courts which have considered the issue to recognize state action in the certification by private doctors leading to commitment is surprising. *Landry v. Odom*, 559 F.Supp. 514, 517 (E.D.La. 1983) (private psychiatrist's issuance of commitment certificate "without something more is not sufficient to justify characterization of him as a state actor"); *Joyce v. Ferrazzi*, 323 F.2d 931, 933 (1st Cir.1963) (doctor acted as private practitioner in committing patient to mental institution under state law); *Whittington v. Johnston*, 102 F.Supp. 352 (M.D.Ala.1952). (physician who declared plaintiff insane resulting in incarceration pursuant to state law acting in private capacity). If the state is not providing the authority to deny an individual his liberty what is providing the authority?

It is even more surprising to find that a number of courts have found no state action where the physician certifying the commitment is an employee of the state or appointed by the state to a committee to certify the commitment. *See Spampinato v. M. Breger & Co.*, 270 F.2d 46 (2d Cir.), *cert. den.*, 361 U.S. 944, 80 S.Ct. 409, 4 L.Ed.2d 363 (1959) (certifying psychiatrist on staff of a city hospital who authorized detention of plaintiff for 17 days in a psychopathic hospital ward was acting in the capacity a private citizen); *Byrne v. Kysar*, 347 F.2d 734 (7th Cir.), *cert. den.*, 383 U.S. 913, 86 S.Ct. 902, 15 L.Ed.2d 668 (1965) (physician had acted in his capacity as a private physician in diagnosing and certifying as to plaintiff's condition although he was an employee of the city, relying on *Duzynski v. Nosal*, 324 F.2d 924 (7th Cir. 1963); *Hall v. Quillen*, 631 F.2d 1154 (4th Cir.1980), *cert. den.*, 454 U.S. 1141, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982) (no state action where physician examined plaintiff under court appointment for involuntary commitment proceedings).

Other courts have immunized court-appointed certifying physicians by finding their "quasi-judicial" function entitles them to absolute judicial immunity. *Byrne v. Kysar*, 347 F.2d 734 (7th Cir.1965).

The Third Circuit, however, has not taken the route of failing to recognize state action where the health care providers are employees of the state. *Hicks v. Feeney*, 770 F.2d 375 (3rd Cir.1985). The harder question is whether there is state action if the certifying physician is not employed by the state.

---

**5.** Judge Becker of the Third Circuit has argued that since those who are civilly committed are not protected "by the panalopy of procedural safeguards found in the criminal system," and since they may not have committed any acts justifying their commitment, they must be afforded "a limited right to treatment" rather than mere custodial confinement. *Clark v. Cohen*, 794 F.2d 79 (1986 3rd Cir.) (concurrence)

(Judge Becker did not join Judge Gibbons in the majority opinion which held that the 11th Amendment does not preclude injunctive relief which will require the state to expend funds for future treatment and training necessary to undo past violations of plaintiff's constitutional rights due to her commitment for over 28 years in a state institution for the retarded without notice or a hearing based on a mistaken diagnosis).

The Fourteenth Amendment of the Constitution provides in part that no state shall deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Title 42 U.S.C. § 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when deprivation takes place "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory...." The issue presented is whether a private physician's certification of commitment pursuant to the New Jersey civil commitment statute is an action properly attributable to the state for purposes of maintaining a section 1983 action.

The Third Circuit summarized the law holding that involuntary commitment implicates the liberty interest protected by the Fourteenth Amendment in *Hicks v. Feeney,* 770 F.2d 375, 377 (3d Cir.1985). In *Vitek v. Jones,* 445 U.S. 480, 492, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) involuntary commitment from prison to a mental hospital was held to require due process protections. In *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979) the Court held that civil commitment for any purpose constitutes a significant deprivation of liberty that requires. due process protection. The right of a non-dangerous person to be free from confinement in a mental hospital was shaped by *O'Connor v. Donaldson,* 422 U.S. 563, 575–76, 95 S.Ct. 2486, 2493–94, 45 L.Ed.2d 396 (1975). Involuntary confinement was termed a "massive curtailment of liberty" in *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). Despite such precedent, in New Jersey two private physicians can commit someone for twenty days without their consent and without a hearing.

The contrast to state requirements for compelled medical treatment for physical ailments is instructive. A person must be adjudged mentally incompetent before medical treatment can be imposed against the will of the patient for a physical ailment. *See In re Quackenbush,* 156 N.J. Super. 282, 383 A.2d 785 (Morris County Court, 1978) (county court refused to find patient incompetent when he refused life-saving bilateral amputation for gangrenous conditions in both legs). Similarly, an infectious person cannot be isolated by quarantine without authorization by either the State Department of Health or the local boards of health. N.J.S.A. 26:4–2. But two doctors can certify the dangerousness of a person, requiring their institutionalization without adjudication, thereby depriving an individual of his liberty for up to twenty days. Only an extension of the state's police power could authorize such deprivation of liberty. The notion of civil commitment so offends one commentator that he makes the visionary and unrealistic suggestion of doing away with civil commitment entirely, leaving "disordered" persons to seek voluntary treatment, subject to the sanctions of the criminal justice system. Morse, A Preference for Liberty: The Case Against Involuntary Commitment, 20 *Cal.L.Rev.* 54 (1982).

The decisions holding that committing physicians are not acting under color of state law generally present only the most rudimentary analysis. The opinions announce conclusorily, without an examination of the underlying police power or parens patriae doctrines, that the physician is acting in his or her private capacity. *See, e.g., Byrne v. Kaysar, supra,* 347 F.2d 734. In *Byrne,* a third judge dissented in a three paragraph opinion. He argued that a court-appointed physician, compensated by the court and performing services to satisfy a state statute, is acting under the color of state law, while recognizing "that the numerical weight of authority is opposed to my views." The most thoughtful refusal to find state action appears in *Watkins v. Roche,* 529 F.Supp. 327 (S.D.Ga.1981). After analyzing relevant Supreme Court precedent the court refused to find state action, reasoning:

To open physicians to federal suit by decreeing that they act for the state in making purely medical decisions would effectively chill the use, and accompany-

ing benefit, of a private physician's judgment in an emergency situation simply because the physician may not be willing to give it for fear of being exposed to a law suit. The disadvantage in this is the statutory alternatives do not provide the immediacy of action of a physician's certificate. *Id.* at 330.

However, fear of liability is not one of the factors the Supreme Court has set forth in determining whether there is state action. The Court has articulated various tests in different contexts: e.g., the "public function" test, see *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); the "state compulsion" test, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); the "nexus" test, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); and, in the case of prejudgment attachments, a "joint action test," *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982).

*Flagg Brothers, supra,* set forth a two part test to determine if state action exists in the "total absence of overt official involvement." *Id.* 436 U.S. at 157, 98 S.Ct. at 1734. Plaintiffs are

first bound to show that they have been deprived of a right "secured by the constitution and law" of the United States. They must secondly show that [defendant] deprived them of this right acting "under color of any statute" of the state....

Plaintiff's complaint meets both parts of this test. He was allegedly deprived of his liberty without procedural due process and he was so deprived pursuant to state law.

In *Flagg Brothers,* however, the court recognized that action by a private party pursuant to a state statute, without something more, was not sufficient to justify a characterization of that party as a "state actor." "Something more" might be that the activity is exclusively a public function such as elections. *Id.* at 157, 98 S.Ct. at 1734. Another consideration is whether the state, by its law, has compelled the act. *Id.* at 164, 98 S.Ct. at 1737. In *Flagg Brothers* the Court refused to apply the public function doctrine to find state action in warehousemen's sale of goods on which he had a lien pursuant to New York's Uniform Commercial Code. The court, however, suggested that if the public function doctrine were to be extended "outside of its present carefully confined bounds, the field of private commercial transactions would be a particularly inappropriate area into which to extend it."

The instant action involves deprivation of liberty rather than a commercial transaction. Only the state, pursuant to its police power, has the authority to intrude on that liberty. The "sovereign-function" doctrine adds the "something more" that is needed to find state action where a private individual is acting pursuant to state statute.

For example, if a state contracted with a private corporation to run its prisons it would no doubt subject the private prison employees to § 1983 suits under the public function doctrine. The court noted in Flagg Brothers that certain state functions such as "education, fire and police protection, and tax collection have been administered with a greater degree of exclusivity by states and municipalities" than the resolution of commercial disputes. *Id.* at 163, 98 S.Ct. at 1737. However, Justice Rehnquist, with an abundance of caution, expressed no view (writing for the majority)

as to the extent, if any, to which a city or state might be free to delegate to private parties the performance of such functions and thereby avoid the strictures of the Fourteenth Amendment.

*Id.*

The Supreme Court more recently refined the test to determine when private action

is "fairly attributable" to the state: First, the deprivation must be caused by the exercise of some right or privilege

created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Without a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.

*Lugar v. Edmondson Oil Co.*, 457 U.S. at 922, 937, 102 S.Ct. at 2744, 2753. (1982).

The Court emphasized that a determination of state action is "necessarily fact bound." *Id.* at 939, 102 S.Ct. at 2754. *See Cruz v. Donnelly*, 727 F.2d 79, 82 (3d Cir.1984) ("[T]he critical issue ... is whether the state, through its agents or laws, has established a formal procedure or working relationship that drapes private actors with the power of the state."); *Community Medical Center v. Emergency Medical Services of Northeastern Pennsylvania, Inc.*, 712 F.2d 878, 880 (3d Cir. 1983) (the "lower courts [are] to investigate carefully the facts of each case.")

■ Here, the state has statutorily delegated to physicians its power to deprive an individual of his liberty where the individual suffers from a dangerous mental illness. Courts have found state action where the government has attempted to avoid its constitutional obligations by transferring the function to a private entity. *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Chalfant v. Wilmington Institute*, 574 F.2d 739, 740 (3d Cir.1978) (en banc). Clearly, physicians certifying a commitment have assumed a public function. The state could have developed its statutory scheme to require state public health doctors or state hospital physicians to make competency determinations, just as state actors are required to determine the need for quarantine. Instead it has delegated to physicians its police power to certify institutionalization for up to 20 days whether the physicians are in private practice or are public employees.

There is a negative side to finding state action when private physicians sign certificates of commitment. Private physicians may become more reluctant to provide a certificate of commitment leading to the failure to institutionalize truly dangerous individuals. There may be greater reliance on already overburdened psychiatrists employed by public institutions. Procedures may become more convoluted. A family faced with the difficult decision of whether to seek the commitment of a dangerous family member may prefer a speedy procedure involving private physicians. The more procedural safeguards are exposed to judicial scrutiny, the greater the opportunity for public stigmatization of the individual with the label "dangerously mentally ill." But the costs accompanying a finding of state action in a civil commitment seem relatively insignificant in comparison to the importance of protecting an individual's liberty interest.

■ Physicians need not feel threatened that every signature on a certificate of commitment will lead to a civil rights lawsuit. Officers of the state, exercising discretionary powers in performing their duties are entitled to qualified immunity

insofar as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). *See People of Three Mile Island v. Nuclear Regulatory Commissioners*, 747 F.2d 139, 144 (3d Cir.1984). Only rudimentary due process protections have been found to apply to civil commitment procedures by the Supreme Court. Comment, Involuntary Civil Commitment: The Inadequacy of Existing Procedural and Substantial Protections, 28 *UCLA Law Rev.* 906 (1981). Any physician following New Jersey's commitment statute would meet the current

constitutional standards in this area. *Coll v. Hyland, supra,* 411 F.Supp. 905. To maintain a civil rights action a plaintiff must allege a Constitutional violation, not merely failure to follow state procedures. Here, plaintiff is alleging that his procedural due process rights were violated when Dr. Flicker failed to examine him within 10 days prior to his commitment, as is required by state statute. The Third Circuit instructs that failure to follow state procedures before depriving an individual of a liberty interest is not enough to give rise to a Section 1983 claim. *Drayton v. Robinson,* 719 F.2d 1214 (3d Cir.1983) (failure to follow state procedure before imposing administrative segregation on troublesome prisoner in and of itself does not violate 14th Amendment).

▆ The key issue, then, is whether due process requires adherence to the procedures set forth in the state regulatory scheme that creates the liberty interest or whether the court must make an independent assessment of what process is due. *Id.* at 1218. I conclude that due process does not require strict adherence to New Jersey's statutory commitment procedure. The Supreme Court has affirmed (without opinion) Connecticut's commitment statute which permits an emergency commitment for up to 45 days based upon the certification of *one* physician. *Logan v. Arafeh,* 346 F.Supp. at 1270 (D.Conn.1972), *aff'd,* 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973). Therefore, it is not a Constitutional violation if plaintiff's commitment papers were signed by only one physician, although it would give rise to state claims against the psychiatrist who allegedly failed to examine plaintiff as required.[6]

▆ In conclusion, I find that in addition to being barred by the statute of limitations, plaintiff has failed to make out a cause of action under 42 U.S.C. Section

1983. Furthermore, plaintiff's conspiracy claim under 42 U.S.C. Section 1985(3) is dismissed. Plaintiff has failed to allege that the conspiracy was motivated by animus toward a particular class or group as is required to bring a Section 1985 action. *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

Defendant's attorney is requested to submit an appropriate form of order.

---

6. I note that the Supreme Court's recent opinion in *Davidson v. Cannon,* ── U.S. ──, 106 S.Ct. 668, 88 L.Ed.2d 4095 (1986) does not influence the result because plaintiff in the instant case is alleging intentional as opposed to negligent deprivation of his liberty without due process of law. Furthermore, it remains to be seen whether the court's holding in *Davidson* that the "protection of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials" will be extended to immunize official torts outside of prison walls.