The PRUDENTIAL INSURANCE
COMPANY OF AMERICA,
et al., Plaintiffs,

v.

UNITED STATES GYPSUM COMPANY,
et al., Defendants.

Civ. A. No. 87–4227 (HAA).

United States District Court,
D. New Jersey.

July 21, 1993.

See also 711 F.Supp. 1244.

Edward A. Zunz, Jr., Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for plaintiffs.

Michael F. Moriarty, Robinson, St. John & Wayne, Newark, NJ and Kell M. Damsgaard, Morgan, Lewis & Bockius, Philadelphia, PA, for U.S. Gypsum Co.

Anthony J. Marchetta and Hannoch Weisman, Roseland, NJ, for W.R. Grace & Co.—Conn.

Richard Koehler, Stich, Angell, Kreidler and Muth, P.A., Minneapolis, MN, and Granville D. Magee, Magee & Graham, Wall Township, NJ, for Asbestospray Corp.

Stephen J. Imbriglia, Hecker Brown Sherry & Johnson, Philadelphia, PA, for U.S. Mineral Products Co.

Stephen N. Dermer, Lowenstein, Sandler, Kohl, Fisher & Boyland, Roseland, NJ, for Keene Corp.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This case involves a dispute between plaintiff, The Prudential Insurance Company of America ("Prudential"), and a number of companies that once manufactured products containing asbestos and installed these products in buildings built or subsequently bought by Prudential. Alleging that the hazards of the in-place asbestos caused it to suffer serious economic injury, Prudential claims that defendants violated the Racketeering Influenced and Corrupt Organizations Act, as well as a number of its common law rights.

The defendant group is comprised of the following: W.R. Grace and Company–Conn. ("Grace"), United States Gypsum Company ("Gypsum"), The Celotex Corporation ("Celotex"), United States Mineral Products Company ("Mineral"), the Keene Corporation ("Keene"), Asbestospray Corporation ("Asbestospray"), and National Gypsum Company ("National Gypsum"). After several years of discovery, the defendants have made a number of motions.[1]

This opinion covers the following motions: (1) a motion by defendants Grace and U.S. Gypsum for summary judgment pursuant to Fed.R.Civ.P. 56(b) dismissing Prudential's RICO claims; (2) a motion by Prudential to strike the defenses of statute of limitations pursuant to the doctrine of discovery rule, fraudulent concealment and/or equitable estoppel.

I will discuss these motions in turn.

First, though, I will describe the factual background as plaintiff offers it. When appropriate, I mention instances where particular defendants have explicitly contested certain facts. While some defendants have not contested the facts for the purposes of these motions, many of plaintiff's factual allegations are in dispute.

### I. Factual Background

Prudential is both a property and casualty insurance underwriter and one of the largest real estate investors within the insurance industry. Throughout the relevant time period, Prudential has been a major participant in the development, purchase and financing of major commercial properties throughout the United States. Defendants are or were various companies engaged in the sale of materials, including asbestos, to developers and builders.

In the 1930s and 1940s, some of the defendants as well as others in the asbestos industry began to study the health risks arising from asbestos. The initial studies were prompted by concern about employee exposure and occupational safety generally. Thus, in 1936, U.S. Gypsum, along with the corporate predecessor to defendant Grace, and other asbestos companies had experi-

---

1. These motions are:

(1) Defendants' motion to dismiss Prudential's RICO claims on substantive grounds;

(2) Prudential's motion to strike defendants' statute of limitations defenses based on the doctrines of the discovery rule, fraudulent concealment and equitable estoppel;

(3) Defendants United States Gypsum and Asbestospray's motions to dismiss the RICO claims based on the statute of limitations;

(4) Defendants' motion to dismiss plaintiffs' amended complaint on the basis of the statute of limitations;

(5) Defendants' motion to dismiss Prudential's complaint on the basis of the Statutes of Repose;

(6) Defendants' motion to dismiss Prudential's Breach of Warranty claims;

(7) Defendants' motion to dismiss Prudential's Deceptive Trade Practices Act claims.

ments performed at the Saranac Laboratory at Saranac Lake, New York. The Saranac Lake results showed that tumors developed in white mice exposed to high levels of asbestos. The reports also showed that no threshold limit for asbestos contamination existed. The Saranac studies, and the possible link of asbestos to cancer, were discussed at proceedings of the National Cancer Institute in January 1944, but the ultimate report was published only in 1951. The published report omitted references to human asbestosis and cancer, as well as the finding that there was no safe level of exposure to asbestos.[2]

In 1965, defendants Asbestospray, Mineral, Keene and Celotex began the Sprayed Mineral Fiber Manufacturers Association ("SMFMA"). The SMFMA conducted its own testing program regarding exposure to asbestos during its application. Although the results showed health problems associated with asbestos application, the group declined to release the test results. Asbestospray denies any concealment and instead characterizes the SMFMA's work as follows: "[The SMFMA is] a trade association [established] to work on methods which would minimize the hazards of exposure and yet allow the continued use of sprayed-on asbestos-containing products." Asbestospray further contends that SMFMA asked its technical committee to recommend industry standards for applying sprayed products so as to prevent health hazards.

At about the same time, defendants U.S. Gypsum, Celotex and National Gypsum organized as a group called the Gypsum Association. This group also allegedly performed tests and declined to disclose the results.

Until the 1960s, the defendants provided no warning labels to those that came in contact with their asbestos products. Eventually, U.S. Mineral crafted a warning that read as follows, and which was placed only on the company's disposable product bags:

> This product contains asbestos. Inhalation of asbestos dust over long periods may be harmful. If employees are exposed to dust during use in application, these employees should be equipped with adequate personal protective devices.

The warning did not mention hazards associated with the release of asbestos fibers from in-place asbestos products, and no warnings of any kind appeared in advertisements. For economic reasons, U.S. Mineral Products kept asbestos in its products despite the fact that "[i]t is possible to remove the dust." In 1968, Asbestospray, Keene and Celotex began using U.S. Mineral's warning. Beginning in 1968, defendant U.S. Gypsum began putting warnings on packages containing fireproofing, joint treatment, texture, and plaster products containing asbestos.

Also in the late 1960s, tests performed by defendants revealed the possibility of release of asbestos fiber during the application process. These test results were not released. Instead, certain defendants would assure fireproofing installers or building tenants that their asbestos was "locked in" and would not release, or that there is no health hazard associated with the proper spraying of asbestos on buildings. Moreover, through their lobbying activities, members of the asbestos industry assured the public that asbestos products in their buildings posed no health hazard. Yet a memorandum from Grace's manager of fireproofing products to senior management stated that "we have an ethical obligation to get [asbestos] out." An internal Keene memorandum stated:

> Asbestos has long been known as a health hazard. It has been chiefly associated with asbestosis, a debilitating but not usually fatal lung disease. It was thought to threaten a relatively limited number of people who had heavy occupational or environmental exposure. Awareness of the danger led to a number of occupational safeguards which helped to reduce the known incidence of the disease.

> More recent research has implicated asbestos as a cause, or important contributing factor in lung cancer. It has also shown that asbestos-related diseases can occur 20 to 40 years after exposure. There is some evidence that asbestos is involved in the death of people with little or no known exposure. Since asbestos use

2. U.S. Gypsum explicitly denies any involvement in concealing the Saranac Lake documents.

in the United States has increased at an extremely rapid rate in the last generation, there is a real possibility that asbestos may be a far more serious health hazard than previously suspected, and that it could affect a far larger number of people. According to plaintiff, Grace, Keene and other defendants had by this time developed asbestos-free products yet continued to market their sprayed-on asbestos products.

In 1973, the Environmental Protection Agency ("EPA") banned the spraying of certain asbestos-containing materials. Prudential contends that the EPA at this time did not address in-place asbestos-containing materials. In the wake of this decision, the asbestos industry attempted to persuade the public that in-place asbestos products were safe—that asbestos fibers were locked in and would not release into the air.

Some of the advertisements were taken out in Sweets Catalog, an industry publication distributed nationally that architects and subcontractors refer to in selecting products for buildings. In the publication, the defendants represented that their asbestos was locked in and would not release, that the asbestos-containing building materials were locked in, would not dust or flake and would last for the life of the building. Grace and U.S. Gypsum also advertised in Sweets.

Plaintiffs also allege that the defendants contacted health experts and architects with the specific intent to persuade them that asbestos building products posed no danger since they were locked in.

Prudential's evidence shows that while defendants were making these assurances, they knew them to be false. Defendants allegedly knew that asbestos fibers are continually released over time under normal conditions, and that there is a greater propensity for release if in-place asbestos is disturbed. Some defendants also were allegedly aware of particular problems with their products that belied their representations. For example, a test run by U.S. Mineral showed that its fireproofing product "failed completely" in that the product has "the least resistance to vibration and flaking." The results were never revealed.

Prudential contends that Asbestospray, Keene, U.S. Mineral and Celotex also suppressed the results of tests showing that their products released asbestos fibers while in place in buildings. The SMFMA's tactics included the following: they contacted an expert, who studied the problem and concluded that "asbestos fibers are being added to the air stream passing over sprayed mineral fiber fireproofing." The SMFMA wrote to the expert that the conclusion was "unnecessarily damaging" and asked him to rewrite it. When the report was rewritten to include the same substantive charges, the defendants declined to disclose the results. Instead, the SMFMA cited to two other tests allegedly showing that their products posed no health hazard.

Results of tests done on in-place asbestos by Grace were publicly disclosed, but the methodology and scope of the tests were limited. An internal Grace memorandum stated the following:

> Our fireproofing position will become desperate if we are not successful with our *upcoming fire test at UL.* Accordingly, we should formalize our position with respect to asbestos and be prepared to both submit written comments and appear at the public hearings. We have air sampling data ... reporting the concentrations of airborne asbestos during and after Monokote III spraying. What we do not have is any evidence that these concentrations are or are not hazardous.

Still, Grace publicly proclaimed that its asbestos-materials were safe.

In 1970, defendant National Gypsum, Jim Walter Corporation (the parent company of Celotex), together with other corporations, formed the Asbestos Information Association of North America (AIA/NA). The purpose of the group was "to propagandize asbestos' good points and attempt to explain away the hazards associated with that substance." U.S. Gypsum and Grace sent representatives to AIA/NA meetings.

During the course of its operations, AIA/NA placed stories about asbestos in newspapers and · magazines, distributed copies of medical papers and speeches purporting to represent the dangers of asbestos,

and, all around, attempted to persuade the relevant public that asbestos was not the dangerous material that others said it was. Prudential contends that the work of the AIA/NA convinced people that in-place asbestos-containing products were safe.

Finally, Prudential alleges the following acts by defendants:

(1) Throughout the 1970s, when contacted by architects, installers, building owners and government agencies, defendants represented that in-place asbestos posed no health risk.

(2) In 1979, Arcadius Zielinski, an employee of the Architects and Engineering Department for Prudential's home office properties, reviewed the state of Prudential's buildings to ensure that Prudential would comply with regulations if and when Prudential had to remove any asbestos. He wrote defendant U.S. Gypsum requesting technical information about a few specific products, but raising no questions about potential health problems. U.S. Gypsum responded with unsolicited assurances about its products:

> The small amount of asbestos fibers is securely embedded in the mortar matrix and should not be released to the air unless it is forcefully pulverized or abraded. I am not aware of, nor can I conceive of, a hazardous exposure resulting from properly installed and maintained [asbestos containing material].

(3) In 1983, the EPA mentioned in a guidance document called the Blue Book that commercial buildings should consider operations and maintenance programs to monitor in-place asbestos. In response to the Blue Book, in 1984, defendants Grace, U.S. Gypsum, National Gypsum, Celotex and Keene joined with AIA/NA's special counsel and formed the Safe Buildings Alliance ("SBA"), which focused on problems associated with asbestos in buildings. In 1984 the SBA published and distributed a booklet called "What You Should Know About Asbestos in Buildings." The booklet stated that "experts believe that removing asbestos-containing materials in buildings often does more harm than good" and that proper removal does not pose a potential health hazard. In 1986, the booklet was revised and targeted towards building owners and managers.

## II. Standard for Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.), *cert. dism'd*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A fact is material if it influences the outcome under the governing law. *Id.* at 248, 106 S.Ct. at 2510.

Within the framework set out above, the moving party essentially bears two burdens: First, there is the burden of production, of making a prima facie showing that it is entitled to summary judgment. This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. Once either showing is made, this burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. Second, there is the burden of persuasion. This burden is a stringent one which always remains with the moving party. If there remains any doubt as to whether a trial is necessary, summary judgment should

not be granted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 330–33, 106 S.Ct. 2548, 2556–58, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970); Advisory Committee's Notes on Fed.Rule of Civ.Pro. 56(e), 1963 Amendment; see generally C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (2d ed. 1983).

## III. Discussion

### A. Defendants' motion for summary judgment dismissing plaintiff's RICO claims

This particular motion addresses the only federal claim in this litigation: plaintiff's contention that defendants conducted an enterprise through a pattern of racketeering activity, thereby causing injury to plaintiff's business or property. 18 U.S.C. § 1962(c). For the purposes of this motion, defendants do not contest that they conducted an enterprise through a pattern of racketeering activity. The sole dispute is whether the plaintiff's have demonstrated causation sufficient to defeat a summary judgment motion.

In a case arising under § 1962(c), a plaintiff must show "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990) (citing *O'Malley v. O'Neill,* 887 F.2d 1557, 1561 (11th Cir. 1989)). The RICO statute lists a number of acts that can constitute "predicate acts" composing a pattern of racketeering activity. Prudential alleges that defendants engaged in the predicate acts of mail and wire fraud, see 18 U.S.C. §§ 1961(1)(B), 1341 and 1343.

The causation requirement derives from RICO section 1964(c), which provides that a plaintiff has standing to bring a RICO claim when he or she has been "injured in his business or property by reason of" the racketeering activity. *Brittingham v. Mobil Corp.,* 943 F.2d 297, 303 (3d Cir.1991). A causation requirement may also be found in the elements of the RICO predicate acts. While the statute does not further address the causation requirement, case law has filled in the blanks.

The "by reason of" language of section 1964 means, at the most general level, that the defendant's acts must have in fact caused the RICO injury. But a plaintiff must demonstrate not only causation-in-fact, he or she must also demonstrate proximate, or legal causation. In the context of RICO, proximate causation has been defined as follows: "The RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht* at 24 (citing *Bonsignore v. City of New York,* 683 F.2d 635, 637 (2d Cir.1982) and *Restatement (Second) of Torts* §§ 431, 435 comment b (1965)) (adopted by Third Circuit in *Brittingham, supra* ). Similarly, in *Brandenburg v. Seidel,* 859 F.2d 1179 (4th Cir.1988), the Court of Appeals pointed out that, in making out a civil RICO claim, a plaintiff must demonstrate "proximate" cause, and proximate clause involves an inquiry into whether the defendant's conduct has been "so significant and important a cause that the defendant should be held responsible." *Id.* at 1189 (quoting Prosser and Keeton, *Torts,* § 42 p. 272 (general principle) (5th ed. 1984)). This determination requires the court to take into account "such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." *Brandenburg* at 1189.

Prudential argues that the causation analysis must begin and end with traditional proximate cause principles, and that the question is whether plaintiff has demonstrated a causal link between defendants acts or omissions and its injuries. Thus, in Prudential's view, there is no requirement that the plaintiff actually relied to its detriment on the defendants' alleged mail or wire fraud. Defendants, however, argue that in the context of mail and wire fraud, a plaintiff must prove actual, detrimental reliance in order to state a civil RICO claim.

The question is, then, what does the proximate causation requirement mean in the context of RICO predicate acts of mail and wire fraud. In other words, in the context of

RICO predicate acts of mail or wire fraud, how should the doctrine of proximate cause be informed?

Several courts have addressed this question, and the majority have agreed with defendants' argument. In *Brandenburg, supra*, the Fourth Circuit began its mail and wire fraud analysis with the proposition that a causal nexus is required to state a RICO claim, and ended with the conclusion that "detrimental reliance by the victim ... is necessary to establish injury to business or property 'by reason' of a predicate act of mail fraud within the meaning of § 1964(c)." *Id.* at 1188 n. 10. In other words, the Fourth Circuit interpreted proximate causation in the mail and wire fraud context to require plaintiff to demonstrate detrimental reliance.

This approach has been followed by other circuits as well. In a similar case, the Eleventh Circuit upheld the dismissal of a RICO mail fraud claim because "[p]laintiffs [did] not allege that they, in any way, relied upon the false reports sent to the government or upon the distorted financial statements." *O'Malley v. O'Neill,* 887 F.2d 1557, 1563 (11th Cir.1989). The *O'Malley* court also made this statement while interpreting proximate cause principles. Similarly, several district courts within this Circuit recently held that in order to state a RICO claim, the plaintiff must show reliance on the underlying mail or wire fraud. In *Rosenstein v. CPC International, Inc.,* 1991 W.L. 1783 (E.D.Pa. January 8, 1991) the district judge wrote that "the 'by reason of' language [of RICO] imputes [a] reliance requirement in the mail and wire fraud context." In that case, even though the defendant had made the representations about its products through a national advertisement campaign, plaintiffs could not escape showing actual detrimental reliance. The court held that·in order to prevail,

> it may be relevant to determine for each class member whether they saw the advertisement; whether they believed the advertisement; whether they would have purchased Mazola notwithstanding the advertisement; whether they were concerned about their serum cholesterol levels; whether they interpreted the advertise-

ments similarly to named plaintiffs; and whether they purchased Mazola for reasons unrelated to the cholesterol lowering claims.

*Rosenstein.* Similarly, in *Strain v. Nutri–System, Inc.,* 1990 W.L. 209325 (E.D.Pa. 1990), a district court was faced with plaintiffs who claimed that defendant misrepresented their weight loss program through its advertising campaign. The court wrote:

> In order to recover plaintiffs must establish that they were induced to enroll in the Nutri–System program because they relied on the allegedly fraudulent advertisements and representations and an injury to property or business was sustained. Establishing the causal relationship between the alleged § 1962 violation and the § 1964(c) injury requires the proof of reliance.

*Strain.* *See also Morley v. Cohen* 888 F.2d 1006, 1011 (4th Cir.1989) ("while ... it is not necessary to establish detrimental reliance by the victim in order to make out a violation of the federal mail fraud statute, such reliance is necessary to establish injury to business or property by reason of a predicate act of mail fraud within the meaning of § 1964(c)") (citing *Brandenburg, supra* ).

▮ The approach—supported by the instant defendants—has been described as consistent with "the clear weight of authority", *Rosenstein.* Nonetheless—and it is a close question—I respectfully disagree with these decisions and will decline to read into RICO mail fraud cases a requirement of actual detrimental reasonable reliance.

It is unclear why courts have been reading an "actual detrimental reliance" requirement into RICO. Most likely, these courts were influenced by their view of the nature of common law fraud generally, and were proceeding to read those assumptions into the "by reason of" requirement of RICO section 1964(c). As one commentator has put it, "[e]ither by classifying mail fraud as common-law fraud or by reading reliance into the 'by reason of' provision of the RICO statute, these courts require that reliance be both alleged and proven." C.C. Genco, Note, *Whatever Happened to Durland? Mail Fraud, RICO, and Justifiable Reliance,* 68 N.D.L.R. 333, 373 (1992). The assumptions,

though, are incorrect. *Id.* Actual detrimental reliance is not an element of the underlying predicate crimes of mail and wire fraud.

In order to prove common-law fraud and securities fraud, a plaintiff generally must establish detrimental reliance, and too attenuated a relationship will not suffice to state a claim.[3] But the RICO predicate acts of mail and wire do *not* require actual reliance. Rather, a plaintiff may prove mail fraud by establishing that: (1) defendants engaged in a scheme to defraud, (2) the defendants or someone associated with the scheme used the mails for the scheme, and (3) the use of the mails was for the purpose of effectuating the scheme. *Armco Industrial Credit Corporation v. SLT Warehouse Company*, 782 F.2d 475, 481–82 (5th Cir. 1986). There simply is no requirement of detrimental reliance. *Id.* As the Seventh Circuit has put it, "[t]he aim of the mail and wire fraud statutes is to punish the scheme to defraud rather than the end result." *United States v. Sanders*, 893 F.2d 133, 138 (7th Cir.1990) (citations omitted); *see also Note, supra* at 365 ("the [mail and wire fraud statutes do] not require that the victim of the scheme actually lose money or property.")

Thus, if courts are not finding a reliance requirement in the elements of the predicate acts, they are finding it in the "by reason of" requirement of § 1964(c). However, as outlined above, the "by reason of" language in RICO is to be interpreted in keeping with general tort principles of proximate causation. Of course, "[t]he degree of proximate causality required to recover damages ... will vary with the underlying violation." *Holmes v. Securities Investor Protection Corporation*, —— U.S. ——, ——, 112 S.Ct. 1311, 1328, 117 L.Ed.2d 532 (1992) (Scalia, J. concurring in the judgment). Nonetheless, since the causation requirement is in the RICO statute itself, in determining the "policies" that inform the proximate cause question, the court should be guided in the first instance by the policies of *RICO* generally, and secondarily by the predicate statutory crimes. At any rate, both of these principles

require a finding that actual detrimental reliance is not a necessary element of a RICO claim involving mail and wire fraud.

First, the policies behind RICO itself negate such a requirement. Several years ago, the Supreme Court broadly interpreted the purposes and structure of the federal civil RICO provisions, rejecting many commentators' urgings of a restrictive interpretation. It found that Congress purposefully drafted a broad statute designed to encompass, prohibit, and punish activity that it defined as racketeering. *Sedima, S.P.R.L. v. Imrex Co. Inc.*, 473 U.S. 479, 499, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985). While cognizant of the fact that civil RICO was being used to encompass activity well beyond the range of the "archetypal, intimidating mobster," *Id.* at 499, 105 S.Ct. at 3286, the Supreme Court held that this reality was not contrary to Congress's intent. The Court stated that "the 'extraordinary' uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of 'pattern'." *Id.* at 500, 105 S.Ct. at 3287. If this was Congress' intent, the Court held, it was not for the courts to frustrate it. Thus, the Court stated that Congress did not intend RICO to be hindered by "strict requirements [of] 'standing' to sue and 'proximate cause', as were present in the antitrust area from which RICO grew." *Sedima* at 498, 105 S.Ct. at 3286. As one court stated in explaining these principles, and its effect on "proximate cause":

This rejection [of the antitrust standard] clearly relaxes the RICO proximate cause test from that applied in antitrust, by focussing inquiry on more direct cause and effect relationships than the necessarily more attenuated ones implied by the amorphous concepts of 'anti-competitive' injury and violation. But it is plain that with the matter of RICO injury and RICO violation thus settled, the *Sedima* Court assumed that the normal proximate cause inquiry

---

**3.** Under the federal securities laws, detrimental reliance may be presumed by the "fraud on the market" theory.

into their relationship would be appropriate.

*Brandenburg, supra,* at 1189 n. 11.

The Supreme Court recently affirmed these principles. In *Holmes, supra,* the Court explicitly addressed the "by reason of" requirement of RICO. In so doing, it relied on principles of proximate cause generally. Writing for the Court, Justice Souter stated:

> The notion of proximate cause reflects ideas of what justice demands, or what is administratively possible and convenient.... Accordingly, among the many shapes this concept took at common law was a demand for some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover.

*Holmes* —— U.S. at ——, 112 S.Ct. at 1318. In that particular case, the Court held that "[a]llowing suits by those injured only indirectly would open the door to massive and complex damages litigation which would not only burden the courts but also undermine the effectiveness of treble-damages suits." *Id.* —— U.S. at ——, 112 S.Ct. at 1321. Elaborating on Justice Souter's analysis, Justice O'Connor discussed an issue not addressed in the majority opinion—whether a nonpurchaser or nonseller of securities may bring suit under section 1964(c). She wrote that "[a]lthough the words 'injury in one's business or property' and 'by reason of' are words of limitation, they do not categorically exclude nonpurchasers and nonsellers of securities from the universe of RICO plaintiffs." *Id.* —— U.S. at ——, 112 S.Ct. at 1324 (O'Connor, J. concurring).

In short, the "by reason of" language of RICO entails an inquiry into whether a defendant's action can be said to have proximately caused the plaintiff's injuries. If the plaintiff is harmed in only an indirect way, the plaintiff does not have standing to pursue a RICO claim. Specific detrimental reliance is a sufficient but not necessary element of a RICO cause of action.

Moreover, looking secondarily to the underlying predicate acts to inform the "proximate cause" analysis, in mail and wire fraud prosecutions, the government simply need not prove actual detrimental reliance. Thus, the proximate cause analysis should not be modified to take into account any peculiar "reliance" characteristics of the underlying acts.

In determining what proximate causation means in the context of mail and wire fraud, though, it is helpful, as Justice Scalia pointed out in *Holmes,* to refer to the nature of the underlying act. This is a case of fraud. And "the general rule in fraud cases ... is that you are liable only to an intended victim." *Matter of EDC,* 930 F.2d 1275, 1279 (7th Cir.1991). The victim need not be the primary victim, only an intended victim. *Id.* at 1279.[4]

■ However, assuming that the defendants have committed the acts alleged, it is for a jury to decide, applying the law of proximate cause generally, whether the plaintiffs were in the zone of foreseeable plaintiffs and whether their actions were a substantial factor in causing plaintiffs' harm. I cannot rule as a matter of law that plaintiffs were outside this zone. To the contrary, if Prudential's theory of the case is to be believed, Prudential was certainly an intended victim of the fraud. Prudential alleges that defendants made affirmative misrepresentations about the safety of asbestos to architects, contractors and installers of buildings that it subsequently acquired. Moreover, Prudential alleges that defendants made affirmative misrepresentatives in

---

4. In that case, Judge Posner illustrated this principle with the following hypothetical:

> Suppose you blow up a plane carrying X and Y in order to kill X. If both die in the explosion, you are just as much Y's murderer as X's, not because of the fiction of transferred intent but because you knew that Y (or any other person who might be a passenger on the plane) would die if your plot against X succeeded. It is not a transferred-intent case because nothing went wrong with your plan; it is a case of extreme recklessness, equated to deliberateness.... You killed Y for an ulterior motive, it is true, but most murders have ulterior motives.

*Matter of EDC* at 1279 (citations omitted).

*Sweet's* publication for the purpose of convincing potential plaintiffs to ignore knowledge defendants had about the dangers of asbestos. If Prudential is correct on the facts, the fraud scheme directly targeted entities like Prudential, for the fraud would not have been worth it if large real estate dealers did not continue to buy such buildings. It is true that to some extent, the target class of plaintiffs was the American public at large. But this larger class surely might include Prudential, who stood to keep the defendants' products valuable by continuing to buy buildings containing defendants' products.

Thus, since defendant's motion is based on their proposition that Prudential has not specifically and detrimentally relied upon particular representations of the defendants, the motion must be denied.

I next address Prudential's motion to strike defendants' statute of limitations defenses on the grounds of equitable estoppel.

### B. Prudential's motion to strike defendants' statute of limitations defenses

With this motion, Prudential asks this court to strike the defendants' statute of limitations defenses, based on various equitable doctrines. More specifically, Prudential's argument is that the defendants should be estopped from arguing that Prudential *should have known* about its cause of action prior to the beginning date of the limitations period. As Prudential sums up its argument: "Prudential did not *know* of its injury prior to 1984. It is not necessary for this Court to resolve whether Prudential *should have discovered* its injury at an earlier time. As a matter of equity and as a matter of sound public policy, on that issue defendants' conduct, not plaintiff's, should be determinative." *Plaintiff's brief* at 2.

The defendants' primary argument in response is that Prudential actually knew about its injury prior to six years before the suit was filed. They also argue, though, that Prudential's arguments about the operation of the various doctrines are incorrect, and that the defendants are entitled to argue to a jury that Prudential should have known of its injury prior to 1984.

Although motions to strike are generally decided on the pleadings alone, *see Total 3 Containment, Inc. v. Environ Products, Inc.,* 1992 WL 208981 (E.D.Pa.) (Gawthrop, D.J.), this motion comes in a different posture. Prudential is making fact-based arguments grounded in equity, and I will consider whether the law and the undisputed facts entitled it to relief.

I will deny Prudential's motion on two essential grounds: (1) there are disputed issues of fact as to whether Prudential actually knew of its injury prior to 1984; and (2) the defendants are entitled to argue to a jury that Prudential should have known of its injury prior to 1984. I reject Prudential's argument that the nature of defendants' conduct, and the public policies involved, entitles it to a striking of the defenses as a matter of law.

The parties apparently agree that, since there is no conflict among the various states, and since in the absence of conflict the law of the forum state applies, New Jersey law governs the instant motion.

### 1. Statutes of limitations generally

Statutes of limitations embody particular policy concerns for fairness to defendants. They recognize that it is generally unfair to compel a defendant to defend actions "long after the alleged injury has occurred, when memories have faded, witnesses have died and evidence has been lost." *Lopez v. Swyer,* 62 N.J. 267, 274, 300 A.2d 563, 567 (1973) (citing *Developments in the Law— Statutes of Limitations,* 63 Harv.L.Rev. 1177, 1185 (1950)). Since the statutes themselves embody concerns of fairness and equity generally, courts have recognized that these policies are not furthered by strict adherence to the time period. Thus, in certain circumstances, New Jersey—as well as other states—applies various tolling and equitable doctrines. Prudential relies, alternatively, on three New Jersey doctrines: (1) the discovery rule; (2) fraudulent concealment; and (3) equitable estoppel.

I will address these arguments in turn.

### 2. The Discovery Rule

■ In most cases, the statute of limitations begins to run from the time of the

accrual of the cause of action. However, because application of the general rule works inequities in certain circumstances, New Jersey has adopted an exception to this rule. The discovery rule—which was formulated in the context of medical malpractice cases, see *Lopez*, at 274, 300 A.2d 563; *Bernstein v. Cheslock*, 171 N.J.Super. 566, 410 A.2d 271 (App.Div.1979)—provides that "in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he [or she] may have a basis for an actionable claim." *Lopez* at 272, 300 A.2d 563. The question of whether the plaintiff is entitled to claim the benefit of the discovery rule is for the trial judge. *Lopez* at 272, 300 A.2d 563.

While the discovery rule was formulated in the context of medical malpractice claims, see *Fernandi v. Strully*, 35 N.J. 434, 173 A.2d 277 (1961), it has been extended to other areas as well, in fact, to areas apposite to this case. *See, e.g., New Market Poultry Farms, Inc. v. Fellows*, 51 N.J. 419, 241 A.2d 633 (1968), in which the Court held that a plaintiff's cause of action against a professional engineer and land surveyor, arising from the defendant's miscalculation of acreage, accrued only when the damage was discovered.

This is a prototypical case for application of the discovery rule. When plaintiffs first began purchasing buildings with asbestos, there was no way they could have known about any potential problems with in-place asbestos. Thus, if the discovery rule, or any relevant equitable doctrine, was held inapplicable, this case would be one where "an injured person, unaware that he has a cause of action, should be denied his day in court solely because of his ignorance." *Lopez* at 274, 300 A.2d 563.

However, in its discovery rule argument, Prudential asks this court to modify and extend New Jersey law. While the discovery rule normally tolls the limitations period until a plaintiff knows or has reason to know of the injury [5], Prudential asks this court to find that, in appropriate circumstances—particu-

larly the circumstances of this case—the discovery rule tolls the statute of limitations until the plaintiff actually discovers the injury. In other words, under the proposed Prudential extension, application of the discovery rule would mean that defendants could not argue that Prudential should have known about its cause of action by a particular date.

I decline to adopt Prudential's argument and change New Jersey law.

First, Prudential's argument runs counter to the policies underlying the discovery rule. The justification for the discovery rule lies in equity. The purpose is to ensure that a party is not barred from pursuing an action before he or she has a reasonable basis for believing he or she actually has a claim. Once the party has a reasonable basis for believing he or she has a claim, the justification for the discovery rule ceases. There is no equitable reason to toll the statute of limitations for a party who reasonably should know that a claim exists.

Illustrative is the case of *Graves v. Church & Dwight Co., Inc.*, 115 N.J. 256, 558 A.2d 463 (1989). In that case, the plaintiff had ingested Arm & Hammer baking soda after suffering from mild indigestion. He immediately experienced pain, collapsed on the floor and was taken to a hospital. Doctors discovered a stomach rupture and performed emergency life-saving surgery. While medical reports reported that the stomach rupture was secondary to the ingestion of baking soda, no physician associated with Mr. Graves' care believed that the condition was in fact causally traceable to the ingestion of baking soda. Not until a television program aired detailing the possible causal relationship did the plaintiff give credence to any relationship between the two events.

Relying on the discovery rule, Justice O'Hern wrote that "[t]o suggest that the plaintiff should have known that the baking soda could cause a stomach rupture would attribute to him knowledge superior to that of all the physicians who treated him."

**5.** It appears that the doctrines of "constructive knowledge" and "reasonable diligence" are used interchangeably, to mean that the limitations period begins to run when the plaintiff knows of or has reason to know of his or her cause of action.

*Graves* at 262, 558 A.2d 463 (O'Hern, J. concurring). Thus, the court held that there was no reasonable basis for Mr. Graves to believe he had a claim (until the problem was aired in a television program and until he was contacted by an attorney for another plaintiff). While Prudential argues that this case looked primarily to the actions of defendants, the Court in fact looked at the actions and state of mind of all the relevant parties, to determine the reasonableness of imputing knowledge to the plaintiff.

Second, there is no basis for believing that the New Jersey courts would so extend the discovery rule. As the Third Circuit recently held in another context, "we may not significantly expand state law without a clear indication that the [state] Supreme Court would do the same." *City of Philadelphia v. Lead Industries Association, Inc.*, 994 F.2d 112, 115 (3d Cir.1993). There is no question that the Prudential doctrine would significantly expand state law. After all, most statute of limitations questions involve questions about what the defendant *should* have known. It is frequently uncertain when actual knowledge occurred. Thus, abolishing the reasonably diligent inquiry often would make it impossible for a defendant to plead the statute of limitations in discovery rule cases.

Thus, under the discovery rule doctrine, I find that the defendants are entitled to argue to a jury that Prudential should have known of its causes of action prior to the relevant time period.[6]

▮ At any rate, the defendants argue that Prudential had actual notice of its claims before the longest statute of limitations began to run. Their argument is strong enough to create a disputed issue of material fact which would defeat Prudential's motion to strike.

As one strong example, defendant has submitted an affidavit from a former employee of Prudential, Donald H. Holick, Jr., who was Prudential's Director of Architecture at its real estate investment department in Houston, Texas from 1979 to 1984. According to his affidavit, Mr. Holick was one of three "troubleshooters" responsible for overseeing Prudential's $11 billion real estate investment portfolio in its southern and western regions, an area encompassing twenty-two states. Mr. Holick writes in his affidavit that by 1979 Prudential architects and engineers knew that the presence of asbestos-containing materials in its buildings constituted a potential health hazard to building occupants. He further writes:

> By 1980, in response to company-wide concern that asbestos-containing materials present in buildings owned by Prudential could pose a health risk to building occupants, tenants and maintenance workers, Prudential had requested a meeting with KRC Research Corporation to discuss the current state of the art concerning asbestos containment and removal programs.

Mr. Holick goes on to describe the meeting with KRC, and Prudential's concerns about the asbestos problem. He concludes:

> Due to the great expense that Prudential believed was required to alleviate the asbestos problem in its buildings, the alarm among tenants and unfavorable publicity that Prudential believed would result from immobilizing asbestos-containing materials present in its buildings, Prudential decided to keep the asbestos issue confidential. Prudential also decided to discuss the asbestos issue with tenants on an individual basis, and then only if they complained about the presence of asbestos in their space, rather than convey uniform information about the issue to all tenants throughout its real estate portfolio.

If Mr. Holick's testimony is to be believed, then it would appear that Prudential knew about its causes of action based on in-place asbestos and yet decided to solve the asbestos problem by keeping mum rather than by diligently investigating and pursuing remedies to the problem.

Prudential makes several arguments in response to the Holick affidavit. First, it terms the statements conclusory. But they are not; to the contrary, they present a chronology of Prudential's alleged recognition of a problem and specific steps taken in

---

**6.** Prudential's discovery rule argument ends here: it does not argue that this court should find as a matter of law that it should not have known about their cause of action.

response. Second, Prudential argues that Mr. Holick never informed anyone at Prudential of the views expressed in his affidavit. But in his affidavit, Mr. Holick narrates what he ostensibly believes to have been the general tenor of views at Prudential. He does not simply say that he believed in-place asbestos was a problem.

Third, Prudential states that Mr. Holick's statement is inconsistent with Prudential's actions in investing billions of dollars in real estate between 1979 and 1984, without ever inquiring about or accounting for the possible presence of asbestos-containing material. But it is not outside the range of possibilities that Prudential ignored the concerns of its southern office.

Fourth, Prudential points out that other statements in the record contradict Mr. Holick's recollections, including his statement of his supervisory responsibilities. Therefore, Prudential argues, Mr. Holick's statements cannot be imputed to Prudential. All Prudential has done, with this argument, though, is point to a potential factual dispute. If Mr. Holick is believed, Prudential has actual knowledge. If not, the factfinder may well find the statute of limitations tolled. This is not a question appropriately resolved on this motion.

Thus I cannot grant Prudential's motion to strike the defendants' statute of limitations claims based on the discovery rule doctrine.

### 3. Fraudulent concealment

Prudential next argues that the fraudulent concealment doctrine applies to bar the defendants from making a statute of limitations argument.

The doctrine of fraudulent concealment also tolls the statute of limitations, and avoids giving "a wrongdoer the advantage and benefit of his fraudulent concealment of a cause of action until the statute of limitations has run." *Cheshire Medical Center v. W.R. Grace & Co.*, 764 F.Supp. 213, 217 (D.N.H.1991) (Devine, C.J.) (citing *Lakeman v. LaFrance*, 102 N.H. 300, 156 A.2d 123, 126 (1959)). Fraudulent concealment "tolls the running of the statue until plaintiff discovers the cause of action or discovers facts that reasonably put him on notice of it." *Plain v.*

*Flicker*, 645 F.Supp. 898 (D.N.J.1986). There are two types of fraudulent concealment—self-executing concealment, where an initial wrong is itself fraudulently concealing and where the defendant undertakes no other efforts to conceal; and affirmative concealment, where the defendants have committed a fraud or a wrong and have then undertaken subsequent affirmative acts to conceal that fraud or wrong. *Tomera v. Galt*, 511 F.2d 504, 510 (7th Cir.1975). Prudential appears to be alleging that the defendants engaged in the second type of fraud.

As with the discovery rule issue discussed above, this court is again faced with the question of whether the fraudulent concealment tolls the limitations period until plaintiff actually discovers the fraud or whether the doctrine places some reasonable responsibility upon the plaintiffs.

It does not appear that New Jersey state courts have addressed the question of whether the "due diligence" requirement applies to cases where the defendant has committed affirmative acts to conceal a fraud. However, the view adopted by the majority of courts is that due diligence is required. *See Plain* at 902 (citing cases). Moreover, the two district courts interpreting New Jersey's law both have adopted the majority view, that "the statute is tolled until the plaintiff discovers, or in the exercise of reasonable diligence, should have discovered the fraud." *Hauptmann v. Wilentz*, 570 F.Supp. 351, 397 (D.N.J.1983); *Plain* at 902.

I agree with this interpretation. As Judge Lacey pointed out, in citing a Sixth Circuit case,

the important public policies behind statutes of limitations are not best served if tolled indefinitely, while evidence stales, memories fade and courts and adversaries wait, until the plaintiff at his leisure alleges actual discovery, despite the avalanche of evidence that would put all but the most indiligent plaintiffs on notice of a cause of action.

*Hauptmann* at 398 n. 48 (quoting *Campbell v. Upjohn*, 676 F.2d 1122, 1128 (6th Cir. 1982)).

Moreover, in construing Pennsylvania's fraudulent concealment rule, the Third Circuit reasoned that the policy of the rule does not necessitate a finding that the fraud always negates the statute of limitations. Rather, even the effects of fraud can be cured—when the effects of the fraud are nullified by knowledge or imputable knowledge to the plaintiff. *Urland v. Merrell–Dow Pharmaceuticals*, 822 F.2d 1268, 1273 (3d Cir.1987). The emphasis under Pennsylvania law, the Court said, is on when the effects of fraud have been nullified, and the Court of Appeals held that "the limitations period does not commence in cases of fraudulent concealment until the time of discovery or the date *when with reasonable diligence* one would have been led to the discovery." *Urland* at 1274 (quoting *Swietlowich v. County of Bucks*, 610 F.2d 1157, 1162 (3d Cir.1979)) (emphasis in original).

Thus, if a defendant fraudulently conceals information from the plaintiff, the limitations period is tolled, and will begin running from the time the cause of action is discovered or might have been discovered after reasonably diligent inquiry.

Even under the fraudulent concealment doctrine, then, defendants are entitled to argue that Prudential did not act with reasonable diligence when it was placed on notice of facts creating a diligence requirement.

■■■ Moreover, in order to prevail on its fraudulent concealment defense to the statue of limitations, a plaintiff must prove fraudulent concealment. This in turn requires proof of an intent to deceive and reliance on upon the representations. At least for purposes of this motion, though, Prudential does not wish to prove this. Instead, it argues in its brief:

> Prudential recognizes that proof of actual fraud will involve disputed issues of intent not normally susceptible to adjudication by summary judgment. However, the Court need not consider defendants' intent, or even the truth or falsity of their statements, in order to equitably estop defendants from asserting statutes of limitations defenses. Without regard to intent, and without regard to truth, defendants said what they said and did what they did.

*Plaintiff's brief in support* at 29. In light of this, it is difficult to know how Prudential can claim its right to relief under the fraudulent concealment doctrine.

At any rate, the cases cited by Prudential are inapposite to the issue at hand. First, it cites a number of cases for the proposition that courts have held that asbestos company defendants fraudulently concealed information and therefore tolled the statute of limitations. With the exception of one of these cases [7], though, the courts only held that the fraudulent concealment doctrine was plead adequately enough to avoid dismissing the complaint on a Rule 12(b)(6) statute of limitations motion. For example, in *Town of Hooksett School District v. W.R. Grace Co.*, 617 F.Supp. 126 (D.N.H.1984), Judge Loughlin addressed the defendants' motion to dismiss plaintiffs' asbestos claim pursuant to Rule 12(b)(6). The Court, while recognizing the fraudulent concealment theory, ruled only that "Plaintiff's *allegations* are sufficient to toll the limitations period under both the 'discovery rule' and the doctrine of 'fraudulent concealment.'" *Hooksett* at 129 (emphasis added).[8] Similarly, in *City of Manchester v. National Gypsum Company*, 637 F.Supp.

---

**7.** In *Cheshire Medical Center v. W.R. Grace & Co.*, 764 F.Supp. 213 (D.N.H.1991), when faced with a summary judgment motion by defendant, the Court presented plaintiff's argument and then noted:

> The defendants' discovery-rule argument ... makes no reference to when or whether ... the proper plaintiff in this action had any knowledge or should have discovered, the presence or danger of asbestos....
> Nor do defendants discuss the doctrine of fraudulent concealment.... Here, plaintiff's fraudulent concealment argument is supported

by evidence which indicates defendants' knowledge of the hazards of asbestos long before the use by the Hospital.

*Id.* at 217. In other words, defendants in that case failed to produce any evidence to contradict the plaintiff's showing. The court was compelled, then, to accept plaintiff's supported facts as proven.

**8.** Incidentally, the *Hooksett* court held that in cases of fraudulent concealment, the statute is tolled *only until the plaintiff discovers or in the exercise of reasonable diligence should have discovered the fraud.*

646, 653 (D.R.I.1986), the court again relied on the plaintiff's allegations in applying the tolling principles of fraudulent concealment. *Id.* at 653 ("On a motion to dismiss, the allegation of fraudulent concealment in the complaint is ... sufficient to toll the running of the statute of limitations"); *see also State Farm Mutual Automobile Insurance Company v. W.R. Grace & Co.,* No. 89–3022, slip op. at 4 (C.D.Ill.) (Mills, D.J.) ("Taking as it must all well plead facts in the complaint as true, the Court finds that Plaintiff has adequately pled its entitlement to [the fraudulent concealment doctrine under Illinois law]") (attached as Exhibit B to defendant's brief in opposition to plaintiff's motion).

Second, Prudential cites a number of cases for the proposition that the fraudulent concealment doctrine bars manufacturers from taking advantage of the statute of limitations when the manufacturer has made false or misleading statements concerning the safety of its product. But in *Allen v. A.H. Robins Co.,* 752 F.2d 1365, 1376 (9th Cir.1985), the Ninth Circuit only held that the district wrongfully granted summary judgment to defendants on statute of limitations ground when there were disputed factual issues as to whether fraudulent concealment existed. And in *Knaysi v. A.H. Robins Co.,* 679 F.2d 1366, (11th Cir.1982), *rehearing denied,* 688 F.2d 852 (1982), the Eleventh Circuit ruled that "the facts alleged could, if proved, estop Robins from pleading the bar of the statute of limitations [and] there are obvious questions of fact regarding the alleged misrepresentations made by Robins." *Id.* at 1370.

Finally, as the analysis above demonstrates about the discovery rule, defendants have presented sufficient disputed facts about whether plaintiff had actual knowledge of its claims. Actual knowledge by Prudential would defeat its fraudulent concealment argument as well.

Therefore, plaintiff's motion to strike based on the fraudulent concealment doctrine must be denied.

### 4. Equitable Estoppel

Third, plaintiff argues that with or without fraud, this court should equitably estop defendants from pleading defenses based on statute of limitations grounds.

The New Jersey Supreme Court has recognized that the principle of equitable estoppel can be used to "prevent a defendant from asserting the statute of limitations when the defendant engages in conduct calculated to mislead plaintiff into believing that it is unnecessary to seek civil redress." *Kaprow v. Board of Education of Berkeley Township,* 131 N.J. 572, 622 A.2d 237 (1993). Because the imposition of the equitable estoppel doctrine means that a party is precluded from "asserting rights which might perhaps have otherwise existed", *see Carlsen v. Masters, Mates & Pilots Pension Plan Trust,* 80 N.J. 334, 339, 403 A.2d 880, 882 (1979), the "requirements of equitable estoppel are quite exacting." *W.V. Pangborne & Co. v. New Jersey Department of Transportation,* 116 N.J. 543, 553, 562 A.2d 222, 227 (1989). Despite the "exacting requirements", though, the New Jersey Supreme Court has stated that where "the [statute of limitations] bar is used primarily as a sword rather than a shield and by one who has been responsible to disclose the actionable essentials in the face of a duty to speak, factors of vicarious enrichment become a dominant consideration which we are prone to remedy in equity and good conscience." *State v. United States Steel Corp.,* 22 N.J. 341, 358–59, 126 A.2d 168, 178 (1956).

Thus, in *United States Steel,* equitable estoppel prevented defendants from raising a statute of limitations defense when it failed to fulfill a legal duty to notify the State of escheatable property within its possession. And in *Peloso v. Hartford Insurance Company,* 56 N.J. 514, 267 A.2d 498 (1970), the Court applied the doctrine when the defendant used settlement negotiations to lull plaintiff into delaying the filing of the action.

The case of *Zaccardi v. Becker,* 88 N.J. 245, 440 A.2d 1329 (1982), is illustrative. In that case the plaintiffs first filed a timely complaint. The complaint was dismissed by the court for plaintiff's failure to answer interrogatories. Yet seventeen months passed while the case remained on the docket, and discovery continually was adjourned. Finally plaintiffs moved to restore the case to the trial calender and defendants objected. Af-

ter the case was finally dismissed, plaintiffs filed a new complaint, and defendants raised a statute of limitations defense. On appeal, the Supreme Court held that even though plaintiff's attorney was culpable, "[s]ince defendants' counsel knew that the [first] case remained on the docket, rightly or wrongfully, they had an obligation to notify the court of the fact that the case had been dismissed." *Id.* at 259, 440 A.2d 1329. Thus, defendant was estopped from pleading the statute of limitations.

But while New Jersey courts have a "long history of instances where equity has interposed to bar the statute of limitations where some conduct on the part of the defendant has rendered it inequitable that he be allowed to avail himself of this defense", *see Deluxe Sales v. Hyundai Engineering,* 254 N.J.Super. 370, 378, 603 A.2d 552 (App.Div. 1992) (citing *Lopez v. Swyer,* 62 N.J. 267, 275 n. 2, 300 A.2d 563, 567 n. 2 (1973)), certain principles can be discerned as to when the doctrine is applied.

First, the doctrine is generally applied when a defendant's actions directly impacted plaintiff's decision on whether to file suit, such as when "a defendant has lulled a plaintiff into a false sense of security by representing that a claim will be amicably settled without the necessity for litigation," *see Knight v. Brown Transport Corporation,* 806 F.2d 479, 484 (3d Cir.1986). Examples include false assurances during settlement negotiations, and, as in *Zaccardi,* failure to notify the court of knowledge of a case.

Second, where the basis for application of the doctrine is the defendant's misrepresentations or failures to adhere to a legal duty to disclose, the plaintiff must have relied upon defendants' actions in not filing suit earlier. *See Kaprow,* 131 N.J. at 590, 622 A.2d 237 (claim for equitable estoppel fails because the defendant's actions "did not induce [plaintiff's] reasonable reliance."); *see also Knight* at 487 (equitable estoppel will not be applied "where no fraudulent or deceitful misrepresentations precluded suit"). Finally, irregardless of defendant's conduct, plaintiff is still obligated to act with diligence, *see Knight* at 487 (doctrine will not be invoked "when plaintiff has been less than diligent in

pursuing and pressing his claims"). Under this rule, plaintiff's actions can counter defendant's actions. Of course, plaintiff's actual knowledge of its cause of action would preclude application of the equitable estoppel doctrine.

In fact, defendants' primary argument against application of plaintiff's estoppel claim is that Prudential's actual knowledge of its cause of action defeats any actions taken by defendants allegedly to deter Prudential from filing suit. And, as noted above in the discovery rule discussion of Donald Holick's affidavit, a review of the record persuades me that plaintiff's motion must be denied. Defendants' facts, if proven, could show that plaintiff had actual knowledge of its claims, sufficient to preclude application of equitable estoppel principles at this time.

▮ Prudential then argues that defendants should be equitably estopped from arguing that Prudential should have known of its cause of action prior to when it actually knew of it.

In this regard, Prudential relies primarily on the nature of the defendants' acts, at issue in this case. Specifically, plaintiffs argue that asbestos cases are unique and require particular rules.

Prudential points to language in a New Jersey Supreme Court opinion involving liability of cigarette manufacturers for harms allegedly caused by their products. *Dewey v. R.J. Reynolds Tobacco Company,* 121 N.J. 69, 577 A.2d 1239 (1990). In *Dewey,* the defendant cigarette manufacturer argued that "as a matter of public policy this Court should immunize cigarette manufacturers from liability for the harm caused by their products by finding that no duty exists." *Dewey* at 99, 577 A.2d 1239. Responding, Justice Clifford wrote that:

Defendants' argument completely ignores the extensive efforts of the tobacco manufacturers to saturate the public with information regarding the benefits of cigarette smoking, the aim of which is to rebut the assertions of public-health advocates and the Surgeon General.... We are unable, therefore, to decide that as a matter of public policy, manufacturers of cigarettes

should be immunized from liability for the harms caused by their products.

*Dewey* at 100, 577 A.2d 1239. The Court further noted that its decision "is consistent with the general policy in New Jersey of 'liberally favoring jury resolution of defectiveness issues ... in products liability cases.'" *Dewey* at 100, 577 A.2d 1239 (quoting *Huddell v. Levin,* 537 F.2d 726, 736 (3d Cir.1976)).

*Dewey* is inapplicable to the present case. That case was addressing an argument that for public policy reasons a manufacturer of a particular product is immune from liability. The court in no way addressed the question of whether the defendant could put forward a statute of limitations defense. The court refused to create a right; it did not grant a request to strike a right.

While plaintiffs cite a number of cases that have pointed to the unique nature of asbestos cases, I remain unconvinced of the proposition that the defendants should be precluded from raising the statute of limitations defenses. First of all, despite the harms caused by asbestos, and despite the defendants' alleged actions, the motion still involves competing policy considerations. First is the policy behind statute of limitations generally. Second is the policy against fraud and inequitable conduct. But even when there is inequitable conduct, it is not too much to ask a plaintiff to act reasonably diligently in appropriate conditions. If defendants did in fact act as atrociously as Prudential says they did, then a jury will be convinced that a duty to act with reasonable diligence never arose. If a duty did arise, though, it is not fair to deny that defense to the defendants. In short, then, I am finding that the policies behind and doctrines of the discovery rule and fraudulent concealment adequately protect Prudential's concerns.

I am unwilling to go any farther than those doctrines already go.

## CONCLUSION

For the reasons detailed above, defendants' motion for summary judgment on Prudential's RICO claim is denied. Prudential's motion to strike defendants' statute of limita-tions defenses on the grounds of equitable estoppel is also denied.