**J. Scott CAMPBELL, Plaintiff-Appellant,**

v.

**The UPJOHN COMPANY,
Defendant-Appellee.**

**No. 80–1823.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 10, 1982.
Decided April 29, 1982.

---

Richard C. Walsh, Gordon Miller, Kalamazoo, Mich., for plaintiff-appellant.

Thomas G. Parachini, Brown, Colman & DeMent, Kalamazoo, Mich., for defendant-appellee.

Before KEITH and JONES, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

This is an action brought under § 17 of the Securities Act of 1933, 15 U.S.C. § 77q, and § 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and the Security and Exchange Commission's Rule 10b–5, 17 C.F.R. 6240 § 240.10b–5 (1981).[1] The appel-

1. These sections in relevant part provide as follows:

15 U.S.C. § 77q. **Fraudulent interstate transactions**

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

(b) It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received,

lant alleges that the appellee, Upjohn Company, fraudulently, induced him to sign a merger agreement between the corporation of appellant and a subsidiary of Upjohn, and that Upjohn then fraudulently concealed from him terms of the agreement.

District Judge Benjamin F. Gibson granted the defendant's motion for summary judgment on the ground that the claim of appellant was barred by time by the applicable statute of limitations. The opinion of Judge Gibson is reported at *Campbell v. The Upjohn Co.,* 498 F.Supp. 722 (W.D. Mich.1980).

We affirm.

## I

Only a brief summary of the relevant facts will be presented in this opinion. On this appeal from a grant of summary judgment in favor of the appellee, we accept as true the factual allegations of appellant and draw inferences therefrom in favor of appellant. Reference is made to the comprehensive and well considered opinion of Judge Gibson for a more complete statement of the facts and issues.

Prior to 1969, appellant Campbell and two other men, Edward Wilsmann and Ernest Wunderlich, were the only shareholders of Homemakers, Inc., a small Illinois corporation which specialized in providing health care services. In 1969 Homemakers, in search of additional capital to meet the needs of an expanding business, entered into merger negotiations with defendant Upjohn.

After several meetings and discussions, the initial proposed agreement was reduced to a letter of intent on June 19, 1969. Upjohn would exchange 225 shares of Upjohn stock for each share of Homemakers; in addition six shares each of Wilsmann's and appellant Campbell's Homemakers stock were to be converted into a 5.4 per cent interest in the successor corporation, which Upjohn would have the option of buying out in 1975 at a price very favorable to Campbell and Wilsmann. This latter provision was termed the "back end payment." Appellant asserts that he relied on receiving this "back end payment" throughout the events and years that followed the signing of this first letter of intent.

A second letter of intent was drawn up and signed by the parties on August 11, 1969, after a loan from Upjohn to Homemakers had necessitated for tax purposes a restructuring of the terms of the merger. The parties eliminated the back end payment from the agreement, and decided that Campbell and Wilsmann would retain no interest in the successor corporation. In-

directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.
15 U.S.C. § 78j. **Manipulative and deceptive devices**
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
  (a) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
  (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
17 C.F.R. § 240.10b–5. **Employment of manipulative and deceptive devices.**
  It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
  (a) To employ any device, scheme, or artifice to defraud,
  (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

stead, Upjohn offered them incentive employment plans which would provide many of the same financial rewards originally embodied in the back end payment agreement.

The parties thereafter drew up several drafts of a final merger agreement, none of which contained an employment agreement. Upjohn presented Wilsmann, but not Campbell, with a separate employment agreement. Campbell alleges he was assured orally that the back end agreement was still in effect, that he eventually would receive an employment agreement, and that the discrepancies between the written terms and the oral promises were due to Upjohn's desire to deceive Wunderlich, the third Homemaker's shareholder, whom the parties did not want to share equally in the profits of the merger.

On November 6, 1969, the parties were to sign the merger agreement and close the deal. Campbell alleges that when he arrived for the closing, two Upjohn executives took him into an adjacent room and confronted him about a misrepresentation on his resume. They shoved a resignation agreement in front of him and shouted that if he did not sign it he would be fired immediately after the merger. Campbell alleges that these actions so shocked, humiliated and intimidated him that he signed the resignation agreement, and that then the Upjohn officials ushered him back into the adjoining room, where he signed the merger agreement without reading it.

The merger agreement contained no provision for a back end payment, and no provision for employment of Campbell, although it did contain an employment agreement with Wilsmann. The merger agreement contained an integration clause superseding and nullifying all other agreements to the contrary.

The appellant says he did not read the merger agreement for nearly six years. He asserts that he relied on oral assurances from Upjohn officials and from Wilsmann (who had been made president of the successor corporation) that he would receive the back end payment agreed to in the first letter of intent in June 1969. However, he retained no ownership interest in the successor corporation and had no employment arrangement with it. Both mechanisms for delivering the back end payment had been foreclosed.

Campbell suffered from poor health immediately after the closing. By 1971, however, he had retained a lawyer who helped him extract from an escrow account the last of the Upjohn shares due him under the agreement.[2] This attorney had a copy of the agreement. Nonetheless, appellant says he did not read the agreement or learn of its contents until 1975, when he realized that no back end payment was forthcoming.

He filed this suit in 1975 in a Connecticut state court, alleging that Upjohn had procured his signature on the merger agreement fraudulently by promising the back end payment, and that Upjohn had fraudulently concealed from him the terms of the merger agreement by making oral assertions after the signing that his payment would be forthcoming. The case was removed to the United States District Court for the District of Connecticut and then transferred by stipulation of the parties to the United States District Court for the Western District of Michigan. The parties agree that the applicable statute of limitations is Connecticut's Blue Sky statute, Conn.Gen.Stat. § 36–346(e).[3]

2. Campbell indicated that shares were escrowed to secure certain debts he owed to Homemaker's Inc. These shares and monies escrowed for franchise sales commissions stemming from sales made by Campbell while employed by Homemaker's, were his object when he visited Upjohn's headquarters in 1971. Campbell does not contend that these escrowed shares were in any way related to the back end scheme.

3. Conn.Gen.Stat. § 36–346 provides in part:
   **Civil liability for sales in violation of law**
   (a) Any person who offers or sells a security in violation of section 36–322 or 36–338 is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security.
   *   *   *   *   *   *

## II

The Connecticut limitations statute requires that all actions involving security sales contracts be brought within two years after the sale or exchange involved.[4] The sale in the instant case took place on November 6, 1969, when the defendant procured the signature of plaintiff on the merger agreement, allegedly by intimidation and by the fraudulent promise that it contained provisions for the back end payment.

The appellant, citing *Bauman v. Centex Corp.*, 611 F.2d 1115 (5th Cir. 1980), first argues that his cause of action did not accrue until 1975, when Upjohn failed to make the back end payment. *Bauman* involved a question of Texas law under a Texas statute of limitations. During merger negotiations, the defendant acquiring corporation had misrepresented its intentions to the plaintiff regarding certain business decisions affecting the acquiring corporation's net income, in order to induce the plaintiff to leave one half of his shares of the acquiring stock of the corporation in an escrow account under a reasonable expectation of a certain "earn-out." The Fifth Circuit ruled that although the misrepresented intentions became apparent at an earlier date, the cause of action did not accrue until the escrow agreement expired "since it was possible the earn-out would be made in spite of any misrepresentations by defendants." 611 F.2d at 1119.

■ This reasoning does not apply to the instant case. When the appellant signed the merger agreement, the agreement by its express terms positively foreclosed the possibility of any back end payment. The injury occurred at the moment the plaintiff signed a legally enforceable document which nullified the promises he allegedly had relied upon. His cause of action for fraudulent misrepresentation thus accrued at that moment—the time of "the commission of the last overt act causing injury or damage." *Akron Presform Mold Company v. McNeil Corporation*, 496 F.2d 230, 233 (6th Cir.), *cert. denied*, 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974). (Antitrust cause of action.)

■ The appellant next asserts that the statute of limitations was tolled by the defendant's fraud, under the federal equitable tolling doctrine of fraudulent concealment. Whether, in an action based on a federally created right, this doctrine will permit the tolling of the statute of limitations, is a question of federal law. *Holmberg v. Armbrecht*, 327 U.S. 392, 396–97, 66 S.Ct. 582, 584–585, 90 L.Ed. 743 (1946). In *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975), this court articulated the standards governing a plea of fraudulent concealment in avoidance of a statute of limitations:

> Under F.R.Civ.P. 9(b), the party alleging fraudulent concealment must plead the circumstances giving rise to it with particularity. Three elements must be pleaded in order to establish fraudulent concealment: (1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.

523 F.2d 389 at 394.

With regard to the element of the diligence of plaintiff, this court stated:

> The Supreme Court case of *Wood v. Carpenter* [101 U.S. 135, 25 L.Ed. 807] *supra*, long ago established the standards for pleading fraudulent concealment.

(e) No person may sue under this section more than two years after the contract of sale.
This statute has been repealed, but applies to all actions filed in Connecticut before October 1, 1977. *Dandorph v. Fahnestock & Co.*, 462 F.Supp. 961, 963 n. 4 (D.Conn.1979).

4. As the district court noted, 498 F.Supp. at 726 n. 4, the appellant could have filed this case in Michigan, where these motions were argued after transferral from Connecticut. The appellant then would have had the benefit of Michigan's six year statute of limitations, Mich.Stat. Ann. § 27A.5813 [M.C.L.A. § 600.5813]. *IDS Progressive Fund, Inc. v. First of Michigan Corp.*, 533 F.2d 340, 344 (6th Cir. 1976).

The Court said that an injured party has a positive duty to use diligence in discovering his cause of action within the limitations period. Any fact that should excite his suspicion is the same as actual knowledge of his entire claim. Indeed, "the means of knowledge are the same thing in effect as knowledge itself." 101 U.S. at 143 [25 L.Ed. 807]. If the plaintiff has delayed beyond the limitations period, he must fully plead the facts and circumstances surrounding his belated discovery "and the delay which has occurred must be shown to be consistent with the requisite diligence." 101 U.S. at 143 [25 L.Ed. 807].

*Dayco, supra*, 523 F.2d 389 at 394.

■ The plaintiff's ignorance of his cause of action does not by itself satisfy the requirements of due diligence and will not toll the statute of limitations. *Akron Presform Mold Company v. McNeil Corporation, supra*, 496 F.2d 230, 234 (6th Cir.) *cert. denied*, 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974).

■ In the present case, District Judge Gibson correctly held that, as a matter of law, these actions by the plaintiff do not satisfy the requirement of due diligence in discovering his cause of action. *Campbell v. Upjohn, supra*, 498 F.Supp. 722 at 730–32. The district judge generously allowed a two year period for Campbell to recover from the shock of his forced resignation and the ensuing illness and personal difficulties, *id.* at 732, and found that by then Campbell should have read the merger agreement and learned that its terms were inconsistent with his expectations. Judge Gibson determined that the appellant should have learned of the allegedly fraudulent scheme by October 1973, in view of the following facts: (1) he had in his possession the merger agreement; (2) he had retained counsel in 1971; (3) he was aware of the second letter of intent and the subsequent negotiations; (4) according to his own averments, Upjohn officials already had mistreated him and dashed his expectations by forcing him to resign; (5) by 1971 he had extracted his last share of Upjohn stock from an escrow account and he no longer retained any shares of Homemakers or of the successor corporation; and (6) therefore, there could be no basis for the exchange upon which the back end payment was to be predicated. We agree with the district court and hold that, as a matter of law, these facts should have apprised a diligent plaintiff of his cause of action within the limitations period and that his inaction in the face of these facts does not warrant tolling the statute of limitations.

The appellant nonetheless contends that the due diligence standard does not apply to cases of "active" fraudulent concealment where the defendant has engaged in affirmative acts of concealment beyond the original fraud itself. The appellant cites in support *Tomera v. Galt*, 511 F.2d 504 (7th Cir. 1975). The Seventh Circuit in *Tomera* describes this type of concealment as that in which "the defendant has taken positive steps after commission of the fraud to keep it concealed." 511 F.2d at 510. According to the Seventh Circuit, the rule in such cases is that "[t]his type of fraudulent concealment tolls the limitations period until *actual* discovery by the plaintiff." 511 F.2d at 510 (emphasis added). *Accord, Sperry v. Barggren*, 523 F.2d 708 (7th Cir. 1975); *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591–93 (2d Cir. 1979).

In the present case, the appellant alleges as the acts of "active concealment" the oral assurances of Wilsmann and the Upjohn officials that the back end payment was forthcoming. It is questionable whether these acts constitute concealment at all, since they did not conceal from the plaintiff the means of discovering his cause of action. *Compare Tomera, supra*, 511 F.2d 504 at 510 (officers and promoters withheld information about investments, disbursements, corporate charters, validity of mining leases, loan repayments and other business affairs, so that inquiry by investors into the legitimacy of the operation would have been futile); *Sperry, supra*, 523 F.2d 708 at 711 (defendants did not disclose price offered by third party for shares defendant purchased from plaintiff, until plaintiff

sued and deposed defendant); *Robertson, supra,* 609 F.2d 583, 591–92 (defendant accounting firm had altered work papers and destroyed documentary evidence of its participation in the fraud; its public statements regarding the events were ambiguous and not inconsistent with normal business practices under the circumstances).

Even assuming that the oral assurances in the present case amount to "active concealment", this court joins those circuits which have declined to formulate a separate rule for cases involving active concealment by the defendant. *See, e.g. State of Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687, 694–95 (10th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *In Re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1170 n. 27 (5th Cir. 1979), *cert. denied,* 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). We hold that alleged additional acts of concealment by the defendant beyond the original fraud do not exempt the plaintiff from the requirement of diligence in pleading the federal equitable tolling doctrine of fraudulent concealment.

The facts of the present case demonstrate the wisdom of this holding. The plaintiff asks this court to override the important public policies behind statutes of limitations because he says he relied on the oral assertions of the defendant's officers, without any regard for whether it was reasonable for him to rely on these people who, in the own words of appellant, already had "shocked," "shamed," and "humiliated" him, had "coldly calculated to destroy [his] will," and had forced him to sign a resignation agreement contrary to what he previously had been promised, threatening to fire him if he refused to do so. He would have the statute tolled indefinitely, while evidence stales, memories fade and courts and adversaries wait, until the plaintiff at his leisure alleges actual discovery, despite the avalanche of evidence that would put all but the most indiligent plaintiffs on notice of a cause of action.

Statutes of limitations are vital to the welfare of society and are favored in the law. Stale conflicts should be allowed to rest undisturbed after the passage of time has made their origins obscure and the evidence uncertain. *Dayco Corp. v. Goodyear Tire & Rubber Co., supra,* 523 F.2d 389 at 394 (citations omitted).

A plaintiff who requests the avoidance of these important objectives owes the courts, the public and his adversaries a duty of diligence in discovering and filing his lawsuit.

A rule of diligence will work no injustice in cases of active concealment. Active concealment by the defendant will be be considered in determining the reasonableness of the behavior of the plaintiff under the circumstances. Actions such as would deceive a reasonably diligent plaintiff will toll the statute; but those plaintiffs who delay unreasonably in investigating circumstances that should put them on notice will be foreclosed from filing, once the statute has run. Indeed, in those cases analyzed above which cite the *Tomera* rule, the actions of defendants were such that even reasonably diligent plaintiffs would not have been put on notice. The difference between the two rules may prove to be more illusory than real. *See State of Ohio v. Peterson, Lowry, Rall, Barber & Ross, supra,* 651 F.2d 687 at 695 n. 16:

> The view that there are two distinct doctrines of tolling perhaps derives from a confusion with earlier versions of the equitable rule requiring plaintiff to prove actual diligence. Such proof was excused if defendant had concealed all cause of reasonable suspicion. The exception is redundant under our test based on hypothetical diligence.

We, therefore, hold that the uncontradicted evidence in the pleadings, affidavits, and depositions in the record fails to establish as a matter of law the requisite diligence required of a plaintiff before he may be entitled to the benefit of the federal equitable tolling doctrine of fraudulent concealment.

The judgment of the district court is affirmed. No costs are taxed. Each party will pay his or its own costs on this appeal.