**Charles HILL, et al., Petitioners,**

**v.**

**UNITED STATES DEPARTMENT OF LABOR; Tennessee Valley Authority, Respondents.**

**No. 94–3641.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 3, 1995.

Decided Sept. 28, 1995.

Lynne Bernabei (argued), Michael Subit (briefed), Bernabei & Katz, Washington, DC, for petitioners.

Lynne Bernabei (argued), Bernabei & Katz, Washington, DC, for Austin L. Elliott, Charles A. Daley, Earl R. Petersen, Kay E. Stephens, Edwin Chauvin, Dorothy Moebius, Steve P. Hans, Donald Roberts, Linus C. Issinghoff.

Marva Peace-Jackson (argued and briefed), William J. Stone, U.S. Department of Labor, Office of the Solicitor, Washington, DC, Jackson Woodall, Tennessee Valley Authority, Knoxville, TN, Robert B. Reich, Secretary of Labor, Department of Labor, Washington, DC, for United States Department of Labor.

Justin M. Schwamm, Sr., Asst. Gen. Counsel (briefed), Thomas F. Fine, Sr. Litigation Atty. (briefed), Brent R. Marquand (argued), Jackson Woodall (briefed), Tennessee Valley Authority, Knoxville, TN, for Tennessee Valley Authority.

Before: LIVELY, MARTIN, and DAUGHTREY, Circuit Judges.

LIVELY, Circuit Judge.

The question in this case is whether the limitations period contained in a federal remedial statute should have been equitably tolled. The petitioners are employees of a company that contracted to provide services

to a federal agency and whose contract was terminated for reasons the petitioners contend violated a federal statute. The Secretary of Labor found that the petitioners filed their administrative complaint after the applicable statute of limitations had expired and dismissed the complaint. The petitioners appeal, arguing that fraudulent concealment by the agency tolled the statute of limitations. Upon consideration of the briefs, oral arguments of counsel and the record, we deny the petition for review and affirm the decision of the Secretary.

## I.

### A.

In April 1985, the Tennessee Valley Authority (TVA), a wholly-owned corporate agency and instrumentality of the United States, was seeking an operating license for its Watts Bar facility from the Nuclear Regulatory Commission (NRC). The NRC notified TVA that TVA employees had anonymously raised a number of safety concerns related especially to the nuclear plant under construction at Watts Bar. Consequently, in May 1985, TVA entered into a one-year personal services contract for an amount not to exceed $3.6 million with Quality Technology Company (QTC), a consulting and investigative service. QTC was to develop and implement a program for the identification, investigation, and reporting of issues raised by TVA employees concerning the safety of TVA's nuclear facilities.

QTC developed an employee concern program, the Employee Response Team (ERT), to accomplish these goals. QTC worked under the direction of TVA's Nuclear Safety Review Staff (NSRS). An important part of QTC's contract was the requirement that it maintain confidentiality to protect the employees who raised concerns from possible retaliation by TVA. After the first month of interviews, it became apparent that the employees' concerns far exceeded the expectations of TVA and QTC.

In September 1985, at the request of Representative James Cooper (D.Tenn.), QTC made a presentation to him and other members of Congress concerned with the problems at TVA. TVA representatives attended the meeting. QTC employees also briefed NRC Commissioner James Asselstine and key members of the NRC staff about QTC's findings through the ERT. After this briefing, TVA officials questioned some of the petitioners about their remarks to the NRC. By this time the parties had modified the contract twice, providing for increased payments to QTC.

In September and December 1985 the NRC evaluated the ERT and QTC's performance as generally satisfactory. Under mounting criticism from the NRC of TVA's management of the safety concerns program, TVA considered expanding QTC's role once again. On December 17, 1985, TVA officials met with QTC's President, Owen Thero, and W.S. Schum to discuss the new plan suggested by QTC. Under this proposal, a Management Review Group (MRG) would be formed to review safety concerns and formulate corrective actions, and QTC would assume the management of investigations into employee concerns as a voting member of the MRG. In accordance with TVA's request, on December 27, 1985, QTC submitted a written contract proposal, totaling $11.48 million, to cover its expanded role at TVA under the new plan.

In the meantime, TVA was also investigating other methods to confront its safety problems. In mid-October and November 1985, high-ranking TVA officials met with consultants in the nuclear field to discuss TVA's problems. These consultants included Edward Siskin, William Wegner, and retired Admiral Steven White. TVA officials told the group that the most significant issue facing the Watts Bar program was the employee complaints to QTC and that QTC was finding too many problems. These consultants conducted an inspection of TVA's program in November of 1985 and concluded that the most serious problem faced by TVA concerned its nuclear program management. The petitioners claim they had no knowledge of TVA's involvement with the outside experts.

### B.

On January 3, 1986, TVA entered into a contract for Admiral White to serve as Man-

ager of its Office of Nuclear Power for two years. White's agreement with TVA gave him direct authority to manage, supervise, and control TVA's entire nuclear program, including the power to terminate the QTC contracts. White assumed his duties at TVA on January 13, 1985, arriving with a group of close advisors including Messrs. Wegner and Siskin. By letter dated January 22, TVA advised QTC that it was not accepting the latter's December proposal and that it had decided to limit QTC's role in resolving safety concerns. The letter stated that the reason for the phase-out was that TVA no longer needed QTC since QTC had completed its work under the first phase of the TVA Employee Concern Program. All QTC's contracts were then to expire April 30, 1986.

On January 23, QTC contacted TVA to discuss the letter. After an apparently heated meeting on January 24 that was requested by QTC, the parties agreed that QTC would finish safety concerns investigations that were 80% complete and would develop a system to expurgate employee concern files without violation of employee confidentiality. For these purposes, the parties entered into a fourth amendment to the original contract increasing the contract amount by another $750,000.

The reduction of QTC services immediately became a public issue, with numerous press releases and newspaper articles. In some of their press releases, TVA stated that it phased out QTC's contract because it was lazy, costly, and inefficient. QTC officials were also quoted as disagreeing with TVA's decision.

At the request of Representative Cooper, QTC and TVA officials traveled to Washington to discuss the situation. When Admiral White arrived, he refused to talk with QTC and told Representative Cooper that he would have to excuse the QTC representatives from the meeting or he (White) was leaving. After talking with White privately, Representative Cooper told the QTC officials, "You guys are dead."

On March 28, 1986, TVA terminated the QTC contract altogether. After conducting its own investigation in April of 1986, the NRC concluded that the termination of the QTC contract was an internal management decision.

## II.

On September 22, 1986, an article appeared in the *Knoxville Journal* where Wegner of TVA was quoted as saying, "[w]e were going to have to do something about QTC.... It was a cancer to be dealt with." On October 16, 1986, the petitioners, former employees of QTC, filed a complaint with the Department of Labor, alleging that TVA violated § 210 of the Energy Reorganization Act (ERA), 42 U.S.C. § 5851, a "whistleblower" law. The alleged violation consisted of narrowing the scope of QTC's safety responsibilities and eventually terminating QTC's contract in retaliation for QTC's investigation, corroboration, and public disclosure of nuclear safetyrelated problems complained of by TVA employees.

An Administrative Law Judge (ALJ) issued a Recommended Order dismissing the complaint on the ground that the petitioners were employees of QTC, not of TVA, and therefore were not covered by the antidiscrimination provisions of the ERA. The petitioners appealed to the Secretary of Labor who issued a Decision and Order of Remand, holding that because the petitioners were "employees" and the TVA an "employer" within the meaning of the ERA, they were covered by the Act's antidiscrimination provisions. TVA did not seek review of this holding. The Secretary refused to rule on TVA's motion to dismiss the complaint on the basis of untimeliness, concluding that, on remand, "Complainants will have the burden of proving that the facts justify application of the doctrine of equitable tolling."

After extensive discovery and hearings between June and November of 1990, a different ALJ issued a Recommended Decision and Order dismissing the petitioners' complaints as untimely and finding that there were no grounds for tolling the 30–day time limit contained in the ERA. 42 U.S.C. § 5851(b)(1) (1988).

In their appeal to the Secretary, the petitioners argued that the ERA's 30–day time limit should be tolled since TVA "fraudulent-

ly withheld from QTC the gravamen of its claim against TVA—that TVA discharged complainants in retaliation for their reporting safety violations." On April 21, 1994, the Secretary issued a Final Decision and Order in which he adopted the ALJ's recommendation concerning the timeliness issue and dismissed the complaint. The Secretary concluded that the doctrine of fraudulent concealment applied only to an employer's concealment of its *actions,* not its motivations for an employment decision. The petitioners seek review in this court of the Secretary's final decision.

## III.

### A.

■ Section 210 of the Energy Reorganization Act (ERA) prohibits covered employers from discriminating against employees for participating in the identification of nuclear safety concerns and quality problems. At the time relevant to this action, section 210 provided that,

> [a]ny employee who believes that he has been discharged or otherwise discriminated against by any person in violation of subsection (a) of this section may, within thirty days after such violation occurs, file ... a complaint with the Secretary of Labor ... alleging such discharge or discrimination.[1]

42 U.S.C. § 5851(b)(1) (1988). A claim accrues under section 210 and consequently the 30–day time limitation begins to run, when the alleged discriminatory act occurs, i.e., when the plaintiff is either discharged or otherwise discriminated against. *Id.;* see generally *Adkins v. International Union of Electrical, Radio & Machine Workers,* 769 F.2d 330, 335 (6th Cir.1985); see also *Campbell v. Upjohn Co.,* 676 F.2d 1122, 1126 (6th Cir.1982).

■ The limitations period in section 210 is not jurisdictional, however, and may be extended when fairness requires. See *School Dist. of Allentown v. Marshall,* 657 F.2d 16, 18–19 (3d Cir.1981). The application of equitable principles is warranted when a defendant fraudulently conceals its actions, misleading a plaintiff respecting the plaintiff's cause of action. *Id.* at 19–20; *Andrews v. Orr,* 851 F.2d 146, 151 (6th Cir.1988); *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975).

■ The petitioners argue that the facts of this case warrant the application of equitable principles. Although the petitioners did not file their claim until October 16, 1986, more than six months after TVA terminated the QTC contract, they maintain that their delay in filing should be excused because TVA misled them through its public pronouncements to believe that TVA had discharged QTC for nondiscriminatory business reasons. Thus, they claim section 210's time limitation did not begin to run until September 22, 1986, when they learned of the true reasons for TVA's actions.[2]

### B.

■ This court has stated clearly the requirements imposed on one who relies on fraudulent concealment to avoid the bar of a statute of limitations. In order to succeed, a plaintiff must prove the following: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Dayco,* 523 F.2d at 394; see also *Robinson v. Central Brass Mfg. Co.,* 987 F.2d 1235, 1244 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 92, 126 L.Ed.2d 60 (1993); *Electric Power Bd. of Chattanooga v. Monsanto Co.,* 879 F.2d 1368, 1377 (6th Cir.1989), *cert. denied,* 493 U.S.

---

**1.** The statute has since been amended to allow a petitioner 180 days to file a discrimination claim. 42 U.S.C. § 5851(b)(1) (1992).

**2.** Petitioners argue their claim is one for equitable tolling. However, equitable tolling applies when there is no allegation of impropriety on the defendant's part. See *Cada v. Baxter Healthcare*

*Corp.,* 920 F.2d 446, 451 (7th Cir.1990), *cert. denied,* 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). Petitioners' claim is more precisely one for equitable estoppel: i.e., TVA is equitably estopped from asserting a statute of limitations defense because of its fraudulent conduct.

1022, 110 S.Ct. 724, 107 L.Ed.2d 743 (1990); *Pinney Dock & Transp. Co. v. Penn Central Corp.,* 838 F.2d 1445, 1465 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). Parties who rely on equitable tolling through fraudulent concealment have the burden of demonstrating its applicability. *Pinney Dock,* 838 F.2d at 1465.

■ It is also settled that equitable tolling based on fraudulent concealment is to be narrowly applied since "[s]tatutes of limitation are vital to the welfare of society and are favored in the law." *Dayco,* 523 F.2d at 394 (quoting *Wood v. Carpenter,* 101 U.S. 135, 139, 25 L.Ed. 807 (1879)); see also *Upjohn,* 676 F.2d at 1128. As the Supreme Court has stated, at some point "the right to be free of stale claims ... comes to prevail over the right to prosecute them." *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 554, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974)(quoting *Order of Railroad Telegraphers v. Railway Express Agency,* 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944)).

### IV.

We now consider the petitioners' arguments in light of these well-established principles.

### A.

■ The petitioners devoted much of their brief and oral argument to asserting that, as a matter of law, equitable tolling applies where the defendant has concealed the *motives* for its actions, even though the essential elements of a claim are known. Consequently, they urge this court to reject the Secretary's conclusion that "equitable tolling applies only where a Respondent has concealed its *actions* which give rise to a cause of action, but not when it conceals its motives." (JA at 56)

The petitioners rely on dicta in *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.,* 803 F.2d 250 (6th Cir.1986), as support for their argument. In *Gomez* the plaintiff, a longtime employee of the defendant, claimed he was discriminated against because of his Mexican heritage when the defendant failed to promote him and eventually laid him off. *Id.* at 251–53. He argued that the filing deadline for his discrimination claim should be extended because company officials lulled him with promises to investigate his employment concerns when in fact they never did. Gomez claimed that their failure to do so misled him about their true motivation in not promoting him, i.e., their discriminatory animus. *Id.* at 253–54.

After stating that Gomez's potential cause of action should have been apparent to him earlier, the court stated in dicta, "Perhaps a case for fraudulent concealment could have been made had [the defendant] actively misled Gomez by fabricating reasons for his lack of promotion." *Id.* at 255. The court went on to hold, however, that concealment of motives alone does not toll the statute of limitations, noting that "the essential element in stating a cause for fraudulent concealment is concealment of the *existence* of the claim, as contrasted with concealment of the evidence necessary to prove such a claim." *Id.* (emphasis in original) The *Gomez* court recognized that the plaintiff in effect sought a *"per se"* rule that once an allegedly discriminatory act occurs and the defendant does not admit to it, fraudulent concealment has occurred. The court reasoned that "[a]doption of such a rule would effectively read the statute of limitations out of employment discrimination actions." *Id.*

Other courts have specifically rejected the argument that concealment of motive alone is sufficient to extend a limitations period even though the plaintiff is aware of the unfavorable action taken by the defendant. For example, the Court of Appeals for the Fourth Circuit, in rejecting the argument that active concealment of the reasons for an adverse employment action tolls the statute of limitations, held:

> this contention amounts to little more than a claim that the company's proffered reasons for its adverse employment action were pretextual.... If equitable tolling applied every time an employer advanced a non-discriminatory reason for its employment decisions, it would be "tantamount to asserting that an employer is equitably estopped whenever it does not disclose a

violation of the statute." (Citations omitted.) If this were the case, the [time limit] for filing a charge would have little meaning.

*Olson v. Mobil Oil Corp.*, 904 F.2d 198, 203 (4th Cir.1990).

Similarly, in *Merrill v. Southern Methodist Univ.*, 806 F.2d 600 (5th Cir.1986), the Court of Appeals for the Fifth Circuit rejected the contention that the time limit in Title VII actions does not begin to run until the plaintiff discovers a discriminatory motive for the defendant's unfavorable actions. The *Merrill* court concluded that the time limitation begins to run from the date the plaintiff knew of the alleged discriminatory act, since "[i]t might be years before a person apprehends that unpleasant events in the past were caused by illegal discrimination. In the meantime, under [plaintiff's] theory, the employer would remain vulnerable to suits based on these old acts." *Id.* at 605.

■■■ A deception regarding motive supports application of equitable tolling only where the deception conceals the very fact of discrimination. *Gomez,* 803 F.2d at 255. Equitable tolling through fraudulent concealment is not warranted where a petitioner is aware of all the essential facts constituting discriminatory treatment but lacks direct knowledge or evidence of the defendant's subjective discriminatory motive. *Christopher v. Mobil Oil Corp.*, 950 F.2d 1209, 1216 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992). The critical question is not whether concealment of motives alone constitutes fraudulent concealment, but whether the defendant's alleged fraudulent conduct concealed from the plaintiff facts respecting the accrual or merits of the plaintiff's claim. See *Robinson v. Central Brass Mfg. Co.*, 987 F.2d 1235, 1244 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 92, 126 L.Ed.2d 60 (1993).

The petitioners rely heavily on *Rhodes v. Guiberson Oil Tools Div.*, 927 F.2d 876 (5th Cir.), *cert. denied,* 502 U.S. 868, 112 S.Ct. 198, 116 L.Ed.2d 158 (1991). In *Rhodes,* the plaintiff sued his former employer for age discrimination and argued that the time limitation should be tolled based on the employer's misrepresentations. On Rhodes' severance report, the defendant indicated that Rhodes was discharged because of a reduction in work force and that it would consider rehiring Rhodes in the future. *Id.* at 877. However, two months later, Rhodes learned the defendant had hired a younger replacement for his job at a considerably lower salary. *Id.*

The court concluded that the company's statements lulled Rhodes into not filing his claim sooner since, at the time, "Rhodes did not have enough facts to be sufficiently aware of a possible claim." *Id.* at 880. The oil industry was in a serious recession, and the plaintiff had no reason to suspect he was discharged because of his age. The court therefore applied the doctrine of equitable estoppel, finding that because of the defendant's representations to the plaintiff, "he was precluded from evaluating his legal options until he discovered that he had been misled by the misrepresentations." *Id.*

*Rhodes* is readily distinguishable. In our case there was no obscuring fact such as the deep recession in the oil industry that made a reduction in force a plausible explanation. To the contrary, the entire relationship between TVA and QTC revolved around employee concerns about safety practices in the nuclear program and TVA's alleged failure to respond to these concerns. The most obvious conclusion for the petitioners and other QTC personnel to draw from the elimination of QTC was that they had done their job too well and were being punished. There was no wrongful concealment of TVA's actions within the meaning of *Dayco.*

**B.**

It follows that the petitioners also failed to establish the second *Dayco* requirement—that they failed to discover the operative facts upon which they base their claim within the limitations period. The petitioners in this case, as self-described experts on the ERA, should have been on particular notice by April 1, 1986, that TVA's actions might be violative of that statute. They knew they had been engaged in a protected activity (the investigation and reporting of nuclear safety concerns), that TVA was aware of the pro-

tected activity, and that TVA had taken adverse action against them in terminating the QTC contract. This information alone was sufficient to cause a reasonable mind (much less an expert on § 210), to suspect TVA's adverse actions might be in retaliation for the protected activity.

Moreover, petitioners should have suspected TVA's actions were retaliatory. It was the NRC's criticism of its handling of the nuclear safety program that led TVA to hire QTC as an intermediary between TVA and its employees. Implicit in the entire arrangement was the concern that TVA might retaliate against employees for reporting safety concerns. QTC also knew that its own reports had an economic impact on TVA (the Watts Bar facility was not opened), and that TVA had expressed displeasure at QTC's reporting its safety concerns to Congress. In addition to this more general knowledge, the petitioners clearly were aware of Admiral White's hostility toward QTC after the meeting in Representative Cooper's office where White refused even to talk with the Congressman when QTC personnel were present.

The record makes clear that the petitioners had sufficient information, at least by April 1st, to cause them to take action against TVA. Nothing that TVA did or said justified their waiting six months beyond that time before filing the present claim. The petitioners argue, in effect, that they did not interpret TVA's earlier actions as evidence of discrimination until after the filing deadline had passed when they learned on September 22 of the "cancer" statement. This argument confuses notice with evidence. As this court has stated, "To hold that a tolling or suspension of the limitation of actions must continue unless or until proof positive existed of a wrong (which might never be established in fact) would abort the policy of the law of repose in statutes of limitations of diligence in the equitable principles permitting suspension of them." *Pinney Dock,* 838 F.2d at 1478.

### C.

■ We also conclude that the petitioners failed to exercise due diligence, the third *Dayco* element. They were able to evaluate immediately the truth of TVA's stated reasons for its actions (that QTC was lazy, slow and costly), and their failure to do so demonstrates lack of due diligence. The petitioners knew that as late as December 1985 the NRC had evaluated QTC's performance as generally good. Furthermore, TVA's varying news releases should have aroused the petitioners' suspicions that TVA's actions were in retaliation for their protected activity. As the Secretary concluded, the petitioners "simply were not misled into sitting on their rights by TVA's statements." (JA at 56) In order for a fraudulent concealment claim to prevail, a plaintiff must prove that the defendant's attempts to mislead the plaintiff actually succeeded. *Jensen v. Frank,* 912 F.2d 517, 521 (1st Cir.1990).

One of the petitioners, Charles Hill, testified that in January 1986 he felt the reasons given by TVA for terminating the contract were either untrue or inaccurate. (JA at 1117) Petitioners Daley and Hough testified that they knew they were doing a quality job, and therefore they thought TVA was wrong in its criticisms of QTC's performance. (JA at 1160, 1168) Petitioner Bird also testified he did not agree at all with White's criticisms of QTC work as reported in the newspapers. (JA at 1169–72)

Further, some QTC representatives immediately suspected retaliatory motives for TVA's actions. Within a week of the January 22 letter narrowing the scope of QTC's duties, Owen Thero, President of QTC, was quoted in a newspaper article saying that QTC "gave TVA its money's worth.... We did what they wanted and what we're getting in return is a bunch of crap about us trying to get more money out of TVA." (JA at 255) On March 29, 1986, immediately after TVA terminated the QTC contract completely, Thero was quoted in print stating that TVA "has unfairly harassed and maligned" QTC and that his company was considering legal action. (JA at 274)

The petitioners argue that, just because they disagreed with TVA's reasons for terminating the QTC contract does not mean they were aware that these reasons were pretex-

tual. This argument misses the point. Because they disagreed with TVA's reasons in narrowing and eventually terminating the QTC contract and because they had sufficient facts at the time to evaluate the propriety of those reasons, they had a duty to investigate whether TVA acted on illegal motivations, especially in view of TVA's expressions of displeasure with the results of their work. Their failure to do so demonstrates lack of due diligence.

## CONCLUSION

The Secretary found as a fact that by April 1, 1986, the petitioners had sufficient information to file a complaint and were not misled into sitting on their rights by TVA's statements (JA at 55–56, 62), and that they did not exercise due diligence. (JA at 56) These findings are supported by substantial evidence and must be accepted on appeal. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The record simply does not support a finding either that the petitioners were deceived or were oblivious to TVA's possible discriminatory actions until they saw the September newspaper article. They had sufficient facts by April 1, 1986, to alert them to a possible discrimination suit under the ERA, but they failed to pursue their claim. As the Supreme Court has noted, "[o]ne who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." *Baldwin Co. Welcome Center v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 1726, 80 L.Ed.2d 196 (1984).

The petition for review is **DENIED** and the decision of the Secretary is **AFFIRMED.**